978 A.2d 760

**CSX TRANSPORTATION, INC.**

v.

**Richard BICKERSTAFF, et al.**

**No. 770, Sept. Term, 2007.**

Court of Special Appeals of Maryland.

Aug. 26, 2009.

194

196

Evan M. Tager (Andrew J. Pincus, Carl J. Summers, Mayer Brown, LLP on the brief of Washington D.C.) (James E. Gilson, Casey Gilson PC on the brief of Atlanta, GA.) (Douglas F. Murray, Amy E. Askew, Whiteford, Taylor & Preston, LLP on the brief of Baltimore), (Frank Gordon, Millberg, Gordon & Stewart, PLLC on the brief of Raleigh, NC), for appellant.

C. Richard Cranwell & P. Matthew Darby (M. Quentin Emick, Jr., Cranwell, Moore & Emick on the brief of Roanoke, VA) (Guy M. Albertini, Albertini & Darby, LLP on the brief, Baltimore), for appellee.

Panel: WOODWARD, ZARNOCH, and KARWACKI, ROBERT L. (Retired, Specially Assigned), JJ.

WOODWARD, J.

This case involves the consolidated actions of nine railroad employees—Richard Bickerstaff, Eddie Brown, Anthony Davidson, Michael Fedorchak, John Hartman, Robert Hobgood, Stephen Short, Nathaniel Young, and Larry Zientek—appellees, seeking relief pursuant to the Federal Employers' Liability Act, 45 U.S.C. § 51, *et seq.* ("FELA") for cumulative trauma injuries sustained during the course of their employment with CSX Transportation, Inc., appellant. Following a seventeen-day trial, a jury sitting in the Circuit Court for Baltimore City found appellant liable, awarding appellees a total of $15,085,000 in damages.

On appeal, appellant presents eight questions for our review, which we have rephrased:

 I. Did the trial court commit prejudicial error in permitting appellees' counsel to conduct an in-court demonstration using mainline ballast?

 II. Did the trial court abuse its discretion in propounding a jury instruction on assumption of risk?

 III. Did the trial court err in ruling that appellees' claims were timely as a matter of law?

 IV. Did the trial court abuse its discretion in refusing to allow appellant to cross-examine appellees' economist with regard to railroad industry retirement age statistics?

 V. Did the trial court err in declining to instruct the jury on the apportionment of damages?

 VI. Did the trial court err in excluding evidence regarding the Railroad Retirement Board Disability Benefits of Davidson and Young?

 VII. Did the trial court abuse its discretion in denying appellant's motion for new trial on the ground that the jury's verdict was excessive?

VIII. Were appellees' claims precluded by the Federal Railway Safety Act, 49 U.S.C. § 20101 *et seq.* and the regulations promulgated thereunder?

We answer "No" to questions I through IV, VI, and VIII and "Yes" to question V. Therefore, we shall vacate the judgment of the circuit court and remand for a new trial on damages. Accordingly, we do not reach question VII.

## BACKGROUND

On December 22, 2004, Bickerstaff commenced this action against appellant under FELA. On February 14, 2005, Brown, Davidson, Fedorchak, Hartman, Hobgood, Short, Young, and Zientek filed similar FELA actions.

On May 5, 2005, the circuit court consolidated over 50 FELA cases, all involving allegations of personal injury caused primarily by walking on the rocks, or ballast, that makes up the surfaces of appellant's rail yards. The trial judge assigned to the consolidated cases divided the claims into clusters for trial purposes. Cluster IV included appellees—Bickerstaff, Brown, Davidson, Fedorchak, Hartman, Hobgood, Short, Young, and Zientek—each of whom alleged injuries to one or both of his knees and one of whom, Brown, also alleged injuries to his back.

Following a seventeen-day trial beginning on March 5, 2007, and concluding on March 28, 2007, the jury returned a verdict against appellant in favor of appellees. Each appellee received an award ranging from $750,000 to $6,000,000. On March 29, 2007, the court ordered the entry of judgment in favor of appellees. After the denial of its post-trial motions, appellant timely noted this appeal on June 4, 2007.

### A.

### Appellant & Its Rail Yards

Appellant operates rail yards in the Baltimore area and elsewhere in Maryland. A rail yard consists of rows of parallel railroad tracks where trains are parked, taken apart,

and reconfigured into different trains. One or more mainline tracks connect the rail yard to appellant's rail network.

The surface of appellant's rail yards consists of ballast, slag,[1] and cinders. Railroad "ballast," or crushed rock, is the most common surface material and has many different functions depending on its location in the yard. Ballast supports the railroad tracks and track structures, facilitates drainage, and provides a walking surface for railroad employees.

Ballast is graded in different sizes.[2] Large ballast, also termed mainline ballast or track ballast, is about 1″ to 2 3/4″ in size. Mainline ballast best supports the railroad tracks and facilitates track drainage.[3] Small ballast, or walkway ballast, is much smaller than mainline ballast, ranging in size from 3/8″ to 1″. The presence of small ballast in the rail yards provides a relatively safer walking surface. Mainline ballast is not necessary for drainage in the yard as it is on the tracks, because railroads can construct underground drainage systems, which provide adequate drainage for the track system. When mainline ballast is used in the rail yards, it is unstable to walk on and poses a slip and fall hazard.

## B.

### Appellees

Bickerstaff is a 56–year old car inspector with a left-knee condition who was still working at the time of trial. He claimed economic losses of $189,300.

Brown is a 57–year old trainman with a right-knee condition and a herniated disk. He stopped working in August 2006. Brown claimed economic losses of $382,700.

---

1. Slag is a byproduct of steel production.

2. The size of the ballast is determined by the screen through which the rock is sifted. For example, one inch ballast must pass through a screen with one-inch by one-inch gaps.

3. Track drainage is critical to the entire track structure, as an improperly drained track can weaken the entire rail structure, causing the rails to move up and down.

Davidson is a 52–year old trainman with a right-knee condition. He stopped working in October 2007. Davidson claimed $612,700 in economic losses.

Fedorchak is a 53–year old trainman with left- and right-knee conditions who was still working at the time of trial. Fedorchak claimed economic losses of $196,600.

Hartman is a 52–year old trainman with left- and right-knee conditions who was still working at the time of trial.

Hobgood is a 62–year old conductor and flagman with left- and right-knee conditions. He was still working at the time of trial. Hobgood claimed economic losses of $44,400.

Short is a 55–year old conductor with a right-knee condition. He stopped working in May 2005. Short claimed economic damages of $800,000.

Young is a 51–year old trainman with left- and right-knee conditions who was still working at the time of trial. He claimed economic damages of $356,200.

Zientek is a 51–year old car inspector with left- and right-knee conditions. He stopped working in February 2007. Zientek claimed economic losses of $532,500.

## C.

### The Nature of Appellees' Work

Appellees' FELA actions alleged that their knee conditions (and, additionally in the case of Brown, a back condition) were caused by their work in appellant's rail yards. Each appellee had worked for appellant for approximately 30 to 35 years, mainly as a trainman or car inspector.

Brown, Davidson, Fedorchak, Hartman, Hobgood, Short, and Young each held the position as trainman, also termed conductor, brakeman, or switchman. A trainman works in the "yards" and the "roads." In the yard, a trainman "switch[es] cars" and "throw[s] switches," meaning that he separates the rail cars and moves them to different tracks within the yard for the purpose of reconfiguring the trains so that they can

leave the yard in the appropriate order. Switching cars involves repetitive squatting and crouching. A trainman also manually ties down handbrakes, which involves repetitive climbing on rail cars. He couples air hoses, which ensures air flowing to the rear of the train for the mechanical brakes to operate, during which process the trainman repeatedly straddles the rail of the car and assumes a crouching position. During each shift, a trainman walks considerable distances, ranging from five to ten miles.

Bickerstaff and Zientek worked for appellant as car inspectors, or carmen. A car inspector inspects approximately 150 to 200 rail cars per shift to ensure that the cars are in safe operating order. Inspection of each rail car entails repetitive squatting. From a squatting position, the car inspector examines the underneath of the railroad car from several different inspection points. If further inspection is required, the car inspector may crawl underneath the railroad car, sometimes on his hands and knees. During an inspection, a car inspector may have to walk back and forth from one end of the railroad car to another. In a typical shift, a car inspector walks about 5 to 8 miles. In some of appellant's rail yards, the yard consists of about 80% large ballast.

## D.

### The Injuries Sustained

Each appellee claimed to have sustained cumulative trauma over the course of his 30 to 35 years of service working for appellant. Appellees all were diagnosed with osteoarthritis [4] to one or both knees and some claimed injury to the menisci [5]

---

**4.** Osteoarthritis is the deterioration of cartilage, which coats the ends of bones in a joint and allows the bones to smoothly move past each other as the joint moves. Osteoarthritis begins with minor softening or swelling in the cartilage and progresses to the blistering and cracking of cartilage, followed by the actual fissuring or crumbling of cartilage, and finally to its complete degeneration, exposing the end of the bone and resulting in bone-on-bone contact.

**5.** The menisci are crescent-shaped pads of cartilage that sit between the femur and tibia on both the inside and outside of the knee. A healthy

in their knees. Additionally, Brown alleged a cumulative trauma injury to his back. Most appellees had undergone arthroscopic surgery on one or both knees, and many appellees had received injections into their knees of either cortisone, an anti-inflammatory, or Synvisc, a synthetic lubricant. Appellees' medical experts testified that most of the appellees will need knee replacement surgery at some point in the future.

Appellees attributed their injuries to ergonomic risk factors for cumulative trauma injuries associated with the physical activity of trainmen and car inspectors, namely, the repetitive squatting, crouching, crawling, climbing rail cars, mounting and dismounting moving rail cars, and years of walking on mainline ballast. Appellees alleged that appellant negligently used significant amounts of large ballast, rather than small ballast, in its rail yards in violation of industry standards and appellant's own rules.

## E.

### The Verdict

On March 28, 2007, the jury returned a verdict against appellant, determining damages of a total of $19,300,000. Because FELA is a comparative negligence statute, the jury was called upon to allocate appellant's negligence and appellees' contributory negligence. The jury made the following awards:

The total amount of damages for Bickerstaff was $900,000, with 70 percent fault assigned to appellant and 30 percent to Bickerstaff. Damages awarded to Bickerstaff were $630,000.

The total amount of damages for Brown was $2,500,000, with 70 percent fault assigned to appellant and 30 percent to Brown. Damages awarded to Brown were $1,750,000.

---

meniscus absorbs a significant amount of the force from any impact to the knee and protects the cartilage on the femur and tibia. A damaged meniscus can tear, break into pieces, or simply degenerate.

The total amount of damages for Davidson was $2,300,000, with 80 percent fault assigned to appellant and 20 percent to Davidson. Damages awarded to Davidson were $1,840,000.

The total amount of damages for Fedorchak was $1,000,000, with 75 percent fault assigned to appellant and 25 percent to Fedorchak. Damages awarded to Fedorchak were $750,000.

The total amount of damages for Hartman was $850,000, with 90 percent fault assigned to appellant and 10 percent to Hartman. Damages awarded to Hartman were $765,000.

The total amount of damages for Hobgood was $750,000, with 60 percent fault assigned to appellant and 40 percent to Hobgood. Damages awarded to Hobgood were $450,000.

The total amount of damages for Short was $3,000,000, with 90 percent fault assigned to appellant and 10 percent to Short. Damages awarded to Short were $2,700,000.

The total amount of damages for Young was $6,000,000, with 80 percent fault assigned to appellant and 20 percent to Young. Damages awarded to Young were $4,800,000.

The total amount of damages for Zientek was $2,000,000, with 70 percent fault assigned to appellant and 30 percent to Zientek. Damages awarded to Zientek were $1,400,000.

We will set forth additional facts and proceedings below as necessary to discuss the questions presented.

## DISCUSSION

Preliminarily, we acknowledge the unique specimen of case before us. Speaking for this Court, Judge Charles E. Moylan, Jr. recently discussed the special context of a FELA action:

This is no ordinary tort case, although it has some characteristics thereof. It is a FELA case, and that designation places it in a special legal province all of its own with special rules of its own. Although FELA has been on the books for a full century, since 1908, the Maryland case law dealing with it remains skimpy. In *CSX v. Miller*, 159 Md.App. 123, 128–46, 858 A.2d 1025 (2004), we examined in depth its special characteristics. And see *Haischer v. CSX*,

381 Md. 119, 848 A.2d 620 (2004); *Bittinger v. CSX,* 176 Md.App. 262, 932 A.2d 1243 (2007). In *CSX v. Miller,* 159 Md.App. at 129, 858 A.2d 1025, we commented on one unusual feature of a FELA action:

> The FELA law is a hybrid. It hovers ambivalently between workers' compensation law and the common law tort of negligence. It is neither, but it partakes of characteristics of both.

In *Kernan v. American Dredging Co.,* 355 U.S. 426, 431–32, 78 S.Ct. 394, 2 L.Ed.2d 382 (1958), Justice Brennan recounted the provenance of FELA as a deliberate policy recognition that the railroad industry itself was better able to shoulder the cost of industrial injuries and deaths than were the industry's injured workers or their families.

> [I]t came to be recognized that, *whatever the rights and duties among persons generally, the industrial employer* had a special *responsibility toward his workers,* who were daily exposed to the risks of the business and who were largely helpless to provide adequately for their own safety. Therefore, *as industry and commerce became sufficiently strong to bear the burden, the law,* the reflection of an evolving public policy, *came to favor compensation of employees and their dependents for the losses occasioned by the inevitable deaths and injuries of industrial employment,* thus shifting to industry the "human overhead" of doing business. For most industries this change has been embodied in Workmen's Compensation Acts. In the railroad and shipping industries, however, the FELA and Jones Act provide the framework for determining liability for industrial accidents.

(Emphasis supplied).

In *Consolidated Rail Corporation v. Gottshall,* 512 U.S. 532, 542, 114 S.Ct. 2396, 129 L.Ed.2d 427 (1994), the Supreme Court more recently reaffirmed that energizing purpose of FELA:

> Cognizant of the physical dangers of railroading that resulted in the death or maiming of thousands of workers

every year, Congress crafted a *federal remedy that shifted part of the " 'human overhead' " of doing business from employee to their employers.*

From FELA's history and its animating philosophy, this Court concluded in *CSX v. Miller:*

Thus, although the FELA is not a workers' compensation act, *the social forces that produced it and the generating spirit that drives it resonate with the language and philosophy of workers' compensation principles.*

159 Md.App. at 131, 858 A.2d 1025 (emphasis supplied). *Norfolk S. Ry. Corp. v. Tiller,* 179 Md.App. 318, 322–24, 944 A.2d 1272, *cert. denied,* 405 Md. 292, 950 A.2d 829 (2008) (emphasis in original).

Additionally in *Tiller,* we set forth the "employee-friendly standard of review" applied in FELA cases. *Id.* at 324, 944 A.2d 1272. A FELA case, we recognized, "calls for an interpretive approach that is significantly different from that which ordinarily prevails in a suit for common law negligence." *Id.* Because FELA is "a broad remedial statute," courts have accorded "a standard of liberal construction in order to accomplish Congress' objects." *Id.* at 325, 944 A.2d 1272 (quotations, alterations, and emphasis omitted). In discussing the standard of review applied in FELA cases in *CSX v. Miller,* 159 Md.App. 123, 145, 858 A.2d 1025 (2004), *cert. denied,* 384 Md. 581, 865 A.2d 589 (2005), this Court observed that "it is not hard to figure out who wins the ties and who gets the benefit of the close calls."

## I.

### Courtroom Demonstration

During the cross-examination of appellees' railroad engineering expert, Raymond Duffany, appellant attempted to demonstrate the gradation process of ballast using mainline ballast, a baseball, and a softball with square-shaped wooden screens. Appellant intended to pass the ballast, baseball, and softball [6] through the screens to demonstrate the process by

---

6. The baseball and softball were meant to represent different sizes of ballast.

which ballast was graded in different sizes. Appellees objected to the demonstration, arguing that it was not substantially similar to replicate the crushing and processing of ballast in a rock quarry. The trial judge permitted appellant to demonstrate the grading process using the ballast and the screens, but refused to allow appellant to use the baseball or softball in connection with the screening process. Upon appellees' continuing objection, the court advised the parties that cross-examination may be used in response to the use of demonstrative evidence.

During the redirect examination of Duffany, appellees' counsel conducted a demonstration during which he put samples of mainline ballast on the courtroom floor and stepped on them. Appellant's counsel objected and the following bench conference ensued:

[APPELLANT'S COUNSEL]: I would like to cite *Andreas* [sic] versus *State*, 372 Maryland 1, 811 A.2d 282, that that demonstration definitely is not substantially similar to the real-life reality of walking in a railroad yard.

THE COURT: Well, the problem I have here is that everybody used those rocks.

[APPELLANT'S COUNSEL]: I didn't walk on them, though.

[APPELLEES' COUNSEL]: You certainly handled them and looked at them.

THE COURT: I think you have to take a deep breath and deal with your recross. I may agree with you. At the moment, I am overruling.

The court overruled appellant's objection.

At the conclusion of redirect examination, appellant's counsel did not conduct any recross examination of Duffany regarding opposing counsel's demonstration. Instead, appellant's counsel moved for a mistrial, which the court denied:

[APPELLANT'S COUNSEL]: To my astonishment, Your Honor, in his redirect of . . . Duffany, [appellees' counsel] demonstrated large ballast, put it on the carpet in this courtroom and proceeded to walk on it, which flew in the

face of every case he cited to the Court in his attempts not to allow the screens.

THE COURT: He did put his foot on it. I thought he was about to fall, to be honest, so I looked the other way at that point.

[APPELLANT'S COUNSEL]: The jury did not—for the record, I wanted to point out the alternate jurors in the second row all stood up, and it was—it was sort of a—

THE COURT: I don't mean to say that I was not aware of what was going on. I just said I turned my head. What I want the record to reflect is that, under the circumstances, that the Court recognizes the concern.

[Appellees' counsel] raised issues as to the use of the rocks. My problem is that the same rocks in question [were], in fact, used by [appellant's counsel] as to be demonstrative of that which would be in the area.

[APPELLEES' COUNSEL]: Yes, Your Honor, excuse me. He laid an appropriate foundation for that. And he, in fact, elicited from [appellees'] own expert witness the testimony that it was a perfectly fair depiction of the screening.

* * *

[APPELLANT'S COUNSEL]: . . . . For the record, I think it was highly prejudicial of [appellees' counsel] to step on those rocks in the presence of the jury because that does not in any way, shape or form replicate the type of walking on rocks that trainmen and car men do in a yard setting.

The rocks were only two or three or four. They were loose. They were on a carpet in a courtroom.

As Your Honor is well aware, when evidence goes back to the jury, you instruct the jury not to undertake demonstrations of that type or experiments of that type.

THE COURT: Well, that is not generally an instruction, but it may be requested.

[APPELLANT'S COUNSEL]: Well it is often requested, Your Honor.

THE COURT: Sure.

[APPELLANT'S COUNSEL]: I think it was highly prejudicial and highly inaccurate and flew in the face of all the case law that [appellees' counsel] had just brought to the Court's attention not 30 minutes earlier.

* * *

[APPELLEES' COUNSEL]: Your Honor, we approached the bench with respect to the objection that [appellant's counsel] had raised.

I walked back and laid the rocks on the corner, walked away, and everybody said the Court had overruled the objection.

I then turned around and proceeded to do what I had attempted to do initially, assuming that the Court had overruled the objection that [appellant's counsel] had stated because, look, they are the ones that opened the rocks up.

They are the ones that brought the rocks into the courtroom, not me. They are the ones that stuck them through there. They are the ones that established they were mainline ballast.

What they want to do is, every time, they want to handcuff [appellees]. They don't want us to put any evidence at all on.

* * *

THE COURT: ... [O]n this Motion, I will say, [appellees' counsel], you came to the edge. I will say, [appellant's counsel], I don't think you crossed the edge.

I am concerned that we do not go too far into this. [Appellees' counsel], you are on notice. But under the circumstances, the Court does believe that it did open itself up for that which did occur.

The motion for mistrial is noted for the record. The record is made as to your objections for the reasons thereof.

[APPELLANT'S COUNSEL]: Thank you.

THE COURT: The motion for mistrial is denied.

Appellant argues that the court erred in allowing "a visually arresting but highly misleading 'demonstration' of walking on large ballast conducted ... by [appellees'] counsel." According to appellant, appellees' counsel's "spectacle" lacked the requisite foundation for the admission of the demonstrative evidence, *i.e.* "that the evidence fairly and accurately depicts what it purports to depict." Further, appellant argues that appellees' counsel "did not have 'the required knowledge' of the subject to make a showing of similarity," and "[b]ecause counsel's performance was not 'substantially similar to the events [at issue], the demonstration was irrelevant as a matter of law.'" According to appellant, the in-court ballast rock demonstration was highly prejudicial to appellant's case, "infect[ing] the entire debate over the effect that walking on large ballast has on the human body."

■ Appellees respond that appellant's argument "must fail" because it provides no theory of how the court abused its discretion.[7] Additionally, appellees contend that appellant made no attempt to mitigate "any perceived prejudice" from the demonstration by challenging it on recross-examination of Duffany or by requesting a curative instruction, and therefore,

---

7. Appellees also contend that appellant "opened the door" to appellees' counsel's demonstration because appellant first conducted a demonstration using the same mainline ballast. In its reply brief, appellant responds that "standing and walking on samples of ballast scattered in the courtroom floor [did] not 'respond to'" appellant's introduction of samples of ballast, comparison of that ballast to every day objects, and demonstration on that ballast to show how ballast passes through screens during the quarrying process. Appellant urges that, whereas "[t]he purpose of CSXT's demonstrations was to give the jury a frame of reference so that it could differentiate between different types of ballast .... [,][t]he spectacle presented by [appellees'] counsel did not rebut CSXT's demonstrations of the relative *size* of ballast or the quarrying process for making ballast." We agree with appellant.

appellant "should not be heard now to complain that the trial court erred."[8] Lastly, appellees argue that appellant "cannot claim prejudice since its own evidence," namely a video of a graduate student walking on mainline ballast in a rail yard in which the student rolled his foot and almost fell, "confirmed the nature of walking on ballast." Appellees point out that appellant's own expert stated that foot rolling and nearly falling could occur 600 times per day. Appellees urge that "[appellant's] own evidence was far more damaging than anything counsel for [appellees] did in the [c]ourtroom."

" '[T]he decision to admit demonstrative evidence rests with the sound discretion of the trial court.' " *Andrews v. State*, 372 Md. 1, 20, 811 A.2d 282 (2002) (quoting *Ware v. State*, 348 Md. 19, 65, 702 A.2d 699 (1997)). In *Andrews*, the Court of Appeals reiterated the "proper procedure for admission of demonstrative evidence:"

"Demonstrative evidence has been described as physical evidence that 'helps the jurors understand the testimony, but it is otherwise unrelated to the case.' " Demonstrative evidence is generally offered for clarification or illustration of the witness's testimony and it need not be original or authentic. "Instead, the theory justifying admission of these exhibits requires only that the item be sufficiently explanatory or illustrative of relevant testimony to be of potential help to the trier of fact."

\* \* \*

"Professor McLain discusses the foundation requirements for demonstrative evidence:

"A foundation simply must be laid through the witness's testimony that the evidence fairly and accurately depicts what it purports to depict (a subject as to which the

---

8. Relying on *Andrews v. State*, 372 Md. 1, 811 A.2d 282 (2002) for the proposition that neither cross-examination nor a curative instruction is sufficient to remedy the effect of certain demonstrative evidence, appellant argues that appellees' assertion regarding mitigation is "misguided."

witness has the required knowledge) and that it will be helpful to the witness in explaining his or her testimony. It is then admissible in the trial court's discretion...."

\* \* \*

"The court must weigh the demonstrative evidence's probative value against the possibility of unfair prejudice or confusion."

372 Md. at 20–21, 811 A.2d 282 (quoting *Ware*, 348 Md. at 65, 702 A.2d 699) (citations omitted).

The *Andrews* Court further opined:

In-court demonstrations are permitted with the court's permission, if the pertinent conditions are substantially the same as at the time in question, and if the procedure will not be unduly time-consuming, confusing or likely to arouse unfairly emotional reactions in the jury. This Court has applied these general principles to demonstrations involving objects and required that the party seeking to utilize the demonstration make a preliminary showing that what the demonstration is expected to establish is "substantially similar" to the facts and circumstances at issue.

\* \* \*

We have further stated that "demonstrative evidence need not be original in order to be admissible, [however,] there must be *'ample evidence'* that the item offered as demonstrative evidence is *substantially similar* to the item that actually played a part in the events at issue." As we see it, the "substantially similar" requirement gives effect to the initial relevance determination required of all evidence by [Maryland] Rule 5–402. Without the substantially similar requirement serving as a gatekeeper to the admission of demonstrative evidence, the net effect would be the admission of all demonstrative evidence, whether relevant or irrelevant.

*Id.* at 21–22, 811 A.2d 282 (citations omitted) (emphasis in original).

Appellant relies on the facts of *Andrews,* analogizing the impropriety of the demonstration in that case to the demonstration by appellees' counsel in the instant case. In *Andrews,* the petitioner was alleged to have caused the death of his infant daughter by "Shaken Baby Syndrome." 372 Md. at 3–4, 811 A.2d 282. On appeal of his conviction for reckless endangerment,[9] the petitioner argued that the circuit court erred by permitting, in front of the jury, a demonstration of the amount of force necessary to cause injury associated with Shaken Baby Syndrome by using a doll dissimilar to the infant alleged to have been shaken. *Id.* at 4, 811 A.2d 282.

The Court of Appeals in *Andrews* held that the trial court erred in permitting the demonstration "without requiring the State to establish the substantial similarity between the in-court demonstration and the event at issue." *Id.* at 27, 811 A.2d 282. The Court observed that "the differences between the doll and the victim were not insignificant, but, rather, were substantially material to the determination of the amount of force necessary to constitute Shaken Baby Syndrome." *Id.* at 25, 811 A.2d 282. By allowing the State to proceed with the demonstration without satisfying its burden of establishing substantial similarity, the Court explained that "[t]he net effect ... was to weaken the petitioner's ability to challenge the demonstration on cross-examination." *Id.* at 25–26, 811 A.2d 282. Without the proper foundation of similarity, the Court concluded that the in-court demonstration may have mislead the jury in their deliberation, and thereby prejudiced the petitioner. *Id.* at 26–27, 811 A.2d 282. Even considering the cautionary instruction given to the jury "acknowledging that the demonstration was not an 'accurate reenactment' and only an opinion," the Court was not persuaded that such instruction cured "any possible prejudice" the petitioner may have suffered. *Id.* at 27, 811 A.2d 282.

9. The petitioner was found not guilty of second-degree depraved heart murder, involuntary manslaughter, and child abuse. *Andrews,* 372 Md. at 4, 811 A.2d 282.

■ In our view, the trial judge in the instant case erred in permitting the demonstration without requiring appellees' counsel to show substantial similarity between his in-court ballast demonstration and the reality of mainline ballast in a rail yard. *See id.* at 26–27, 811 A.2d 282. Appellees failed to show any evidence—let alone "ample evidence"—of the substantial similarity between the in-court demonstration of walking on large ballast and walking on ballast in a rail yard. *See id.* Moreover, the differences between walking on a small number of loose mainline ballast on the courtroom floor and the mainline ballast in a rail yard are not insignificant. *See id.* at 25, 811 A.2d 282. As appellant explained in its brief:

> [T]he fact that counsel was stepping on genuine large-ballast samples is irrelevant. By placing individual rocks on the smooth, hard courtroom floor,[10] [appellees'] counsel destroyed any similarity between his demonstration and [appellees'] work conditions. In the rail yard, large ballast is stabilized from below and on the sides by the dirt in which it is embedded or by the lower layers of ballast into which it has settled, or "interlock[ed]." On the courtroom floor, there was nothing to prevent the individual rocks from slipping or rolling under counsel's feet. . . .

Because appellees failed to lay the proper foundation of substantial similarity, we conclude, as did the Court in *Andrews,* that the demonstration was irrelevant as a matter of law.

■ Appellant next argues that "the only remedy for [the court's] error is a new trial." It is well established, however, that appellate courts "will not reverse a lower court judgment if the error is harmless." *Flores v. Bell,* 398 Md. 27, 33, 919 A.2d 716 (2007). Appellant has the burden on appeal not only to show error but prejudice as well. *Id.* On the showing of prejudice, the Court of Appeals has observed: "Precise standards for determining prejudice have not been established and depend upon the facts of each individual case. Prejudice can be demonstrated by showing that the error was likely to have

---

10. We note that the courtroom floor was carpeted.

affected the verdict below; an error that does not affect the outcome of the case is harmless error." *Id.* (citations omitted).

 *Andrews* is not instructive on the question of error, because in *Andrews* the Court of Appeals was reviewing the trial court's error in the context of a criminal case. On review of error in a criminal trial, error is harmless only when a reviewing court " 'is able to declare a belief, *beyond a reasonable doubt,* that the *error in no way* influenced the verdict.' " *Hoerauf v. State,* 178 Md.App. 292, 327, 941 A.2d 1161 (2008) (quoting *State v. Logan,* 394 Md. 378, 388, 906 A.2d 374 (2006)) (emphasis added). To the contrary, in civil cases

> "[p]rejudice will be found if a showing is made that the error was **likely** to have affected the verdict below. **It is not the possibility, but the probability, of prejudice which is the object of the appellate inquiry.** Courts are reluctant to set aside verdicts for errors in the admission or exclusion of evidence unless they cause substantial injustice. **Substantial prejudice must be shown.** To justify the reversal, an error below must have been . . . both manifestly wrong and substantially injurious."

*Flores,* 398 Md. at 34, 919 A.2d 716 (quoting *Crane v. Dunn,* 382 Md. 83, 91–92, 854 A.2d 1180 (2004) (internal quotations omitted)) (emphasis added). Therefore, whereas reversal in *Andrews* was required unless there was an absence of *"any possible prejudice,"* 372 Md. at 27, 811 A.2d 282 (emphasis added), we need not reverse in the instant case unless the court's error caused *"substantial prejudice."* *Flores,* 398 Md. at 34, 919 A.2d 716 (emphasis added).

 In the case *sub judice,* we are not persuaded that the in-court demonstration substantially prejudiced appellant. We disagree with appellant's assertion that appellees' counsel's demonstration was the "most memorable" and "most misleading" piece of evidence on the effect that walking on large ballast has on the human body. To the contrary, appellant introduced evidence that we regard as more prejudicial to its case. During the direct examination of its ergonom-

ic expert, Dr. Stephen Wiker, appellant played a videotape of a graduate student wearing work boots and walking on main-line ballast in one of appellant's Baltimore rail yards.[11] As the student was walking on the ballast, he took 21 steps, rolled his foot, and tripped on the ballast.

On cross-examination, appellees' counsel replayed the video and proceeded to question Dr. Wiker as follows:

[APPELLEES' COUNSEL]: You counted 21 steps when he stepped on the large rock there and you saw his foot roll?

[DR. WIKER]: Yes.

　　(Whereas, counsel creating chart.)

* * *

[APPELLEES' COUNSEL]: Assuming that for about every 21 steps on the big ballast we see—we get what you saw and assuming they are taking 13,500 steps a day, let me and you do a calculation here. Can you do the math on that?

[DR. WIKER]: That would be about six—

[APPELLEES' COUNSEL]: Hundred. 600, right?

[DR. WIKER]: Ballpark that.

[APPELLEES' COUNSEL]: 600 a day. Now, I want to look at these folks sitting right here today and you tell them, if you turn your foot like that 600 times a day, you don't think it is going to cause them some problems with their knees?

[DR. WIKER]: Well, I am not saying that.

Appellant points out that on redirect examination Dr. Wiker testified that the graduate student tripped because "he stepped on a rock when he was looking at [Dr. Wiker] to get instructions to stop so he wasn't looking down when he

---

**11.** Appellant played a series of videotapes during the testimony of Dr. Wiker of graduate students walking across the rail yards and performing various activities. Dr. Wiker testified that the yards in the videos were chosen because they were "representative surfaces to walk on."

stepped on it."[12] No testimony or other evidence, however, was introduced to corroborate Dr. Wiker's assertion that the student was looking at him for instructions and not looking down. Therefore, we regard the video demonstration, viewed twice by the jury, and the testimony of Dr. Wiker on cross-examination as overshadowing any prejudice that may have resulted from the in-court demonstration of appellees' counsel.

We also note that, despite the trial court's recommendation, appellant never questioned Duffany about the in-court demonstration on recross examination. Additionally, appellant never requested a curative instruction. In the absence of any effort on behalf of appellant at trial to assuage any prejudice resulting from the in-court demonstration by appellees' counsel, we do not conclude that appellant's claim of error on appeal substantially prejudiced appellant. Accordingly, the trial court did not commit prejudicial error by permitting appellee's counsel to conduct a demonstration using mainline ballast.

## II.

### Assumption of Risk Jury Instruction
#### A.

### FELA & Assumption of Risk: Abrogation of the Doctrine

In 1906, Congress passed FELA "in part to eliminate barriers common law courts erected to protect railroad companies and other common carriers from liability for their employees' workplace injuries." *Fashauer v. N.J. Transit Rail Operations, Inc.,* 57 F.3d 1269, 1274 (3rd Cir.1995). For one, FELA "substituted comparative negligence for the strict rule of contributory negligence." *Id.* (internal quotations omitted). Accordingly, unlike under Maryland law, a plaintiff's negligence does not bar a claim for damages under FELA. *See* 45

---

12. Dr. Wiker further testified that he did not observe the graduate student's foot roll to that extent the rest of the day, although Dr. Wiker explained that the student's foot was "pitching and rolling to a minor degree."

U.S.C. § 53 ("[T]he fact that the employee may have been guilty of contributory negligence shall not bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee[.]").

Additionally, following widespread criticism of the retention of assumption of risk as a complete defense to an employer's liability, "Congress amended FELA in 1939 to eliminate the defense in cases where the injury 'resulted in whole or in part from the negligence of any of the officers, agents, or employees' of the employer." *Fashauer*, 57 F.3d at 1274 (quoting 45 U.S.C. § 54). Thereafter, the Supreme Court announced that "every vestige of the doctrine of assumption of risk was obliterated from [FELA] by the 1939 Amendment," directing that FELA cases are "to be handled as though no doctrine of assumption of risk had ever existed." *Tiller v. Atlantic Coast Line R.R. Co.*, 318 U.S. 54, 58, 64, 63 S.Ct. 444, 87 L.Ed. 610 (1943).

## B.

### Instruction on Assumption of Risk

In the case *sub judice*, the court charged the jury on assumption of risk over appellant's objection. The court instructed the jury:

[L]adies and gentlemen of the jury, [ ][i]n any action brought against [appellant] for injury to recover damages for injuries to the said plaintiff or employee, that employee shall not be held to have assumed the risk of his employment in any case where such injury resulted in whole or in part from the negligence of any officer or supervisor of the said railroad or carrier.

And no employee shall be held to have assumed the risk of his employment in any case where the violation by such railroad of any statute enacted for the safety of employees contributed to the injury or death of an employee.

Appellant argues that the court erred in propounding a jury instruction on the doctrine of assumption of risk when appel-

lant "did not plead or argue that it could avoid liability because [appellees] had assumed the risks of their employment." Nor, appellant contends, did appellees present evidence to "create an undue risk that the jury would reduce their recoveries on the impermissible theory" of assumption of risk.

Appellees respond that "the jury was correctly instructed that assumption of risk is not a defense in a FELA case." Appellees contend that appellant "elicited significant testimony . . . to support the giving of an instruction on assumption of the risk;" *e.g.*, making choices to work at a particular rail yard, to mount and dismount moving equipment at a particular speed, to take on a job involving more walking, and to retire. Furthermore, appellees assert that appellant's closing argument emphasized this evidence, thereby "improperly infer[ring] assumption of the risk in the absence of an instruction."

Maryland Rule 4–325(c) provides:

The court may, and at the request of any party shall, instruct the jury as to the applicable law and the extent to which the instructions are binding. The court may give its instructions orally or, with the consent of the parties, in writing instead of orally. The court need not grant a requested instruction if the matter is fairly covered by instructions actually given.

The Court of Appeals has interpreted Rule 4–325(c) as

requir[ing] the trial court to give a requested instruction under the following circumstances: (1) the requested instruction is a correct statement of the law; (2) the requested instruction is applicable under the facts of the case; and (3) the content of the requested instruction was not fairly covered elsewhere in the jury instruction actually given. *Thompson v. State*, 393 Md. 291, 302, 901 A.2d 208 (2006) (internal quotation omitted) (alteration in original).

At issue before us is the second circumstance— whether the court's jury instruction on assumption of risk was

applicable under the facts of the instant case.[13] Rule 4–325 requires " 'that a requested instruction be given only when there is evidence in the record to support it.' " *Flores v. State,* 120 Md.App. 171, 193, 706 A.2d 628 (1998) (quoting *Hof v. State,* 337 Md. 581, 612, 655 A.2d 370 (1995)). In other words, a jury instruction is warranted where the charge requested was "generated by the evidence adduced." *Flores,* 120 Md.App. at 193, 706 A.2d 628 (internal quotation omitted). "Whether the evidence is sufficient to generate the requested instruction in the first instance is a question of law for the judge." *Fleming v. State,* 373 Md. 426, 433, 818 A.2d 1117 (2003).

## C.

### The Doctrine's Place in FELA Actions

In its initial brief, appellant gives the impression that an assumption of risk instruction is never appropriate in a FELA action, emphasizing that an instruction on the doctrine serves only to confuse the jury because assumption of risk plays no role in FELA actions. Appellant's attempt to equate the abolition of assumption of risk as a defense in FELA actions to a judicial mandate to refuse to instruct the jury on the doctrine in such cases misstates the law. An instruction that directs the jury *not to consider* assumption of risk as a defense is not unusual. When evidence is adduced at trial implicating the doctrine of assumption of risk, the trial court is charged with adequately distinguishing conduct constituting contributory negligence from conduct covered by the doctrine of assumption of risk. *See Jenkins v. Union Pac. R.R. Co.,* 22 F.3d 206, 212 (9th Cir.1994) (agreeing with other circuit courts of appeal that, when the evidence so requires, an instruction on assumption of risk "prevent[s] the jury from considering

---

**13.** As previously stated, assumption of risk is not a defense to liability under FELA. 45 U.S.C. § 54; *Tiller v. Atlantic Coast Line R. Co.,* 318 U.S. 54, 58, 63 S.Ct. 444, 87 L.Ed. 610 (1943). Further, the content of the instruction on assumption of risk was not fairly covered by the other instructions given.

the forbidden defense of assumption of the risk while allowing it to make factual findings on the issue of comparative negligence" (alteration in original) (internal quotation omitted)).

In fact, reviewing courts have found reversible error in FELA cases involving a trial court's refusal to instruct the jury on assumption of risk. *See, e.g., Koshorek v. Pa. R.R. Co.*, 318 F.2d 364, 369–70 (3rd Cir.1963); *Hamrock v. Consol. Rail Corp.*, 151 Ill.App.3d 55, 103 Ill.Dec. 736, 501 N.E.2d 1274, 1280 (1986), *appeal denied by*, 113 Ill.2d 574, 106 Ill.Dec. 47, 505 N.E.2d 353 (1987). Appellate courts have also upheld a trial court's decision to propound a jury instruction on assumption of risk. *See, e.g., Atl. Coast Line R. Co. v. Burkett*, 192 F.2d 941, 943 (5th Cir.1951); *Vandaveer v. Norfolk & W. Ry. Co.*, 78 Ill.App.2d 186, 222 N.E.2d 897, 906 (1966); *Mo. Pac. R.R. Co. v. Ballard*, 250 Ark. 1094, 469 S.W.2d 72, 74 (1971); *Curtis v. Atchison, T. & S.F. Ry. Co.*, 363 Mo. 779, 253 S.W.2d 789, 794 (Mo.1952); *Ford v. Louisville & Nashville R.R. Co.*, 355 Mo. 362, 196 S.W.2d 163, 169 (1946).

## D.

### Contributory Negligence v. Assumption of Risk

▮▮▮▮▮ Because contributory negligence reduces a plaintiff's damages under FELA while assumption of risk does not, "courts have the delicate job of separating out evidence on one theory from evidence on the other." *Fashauer*, 57 F.3d at 1274. When the doctrine of assumption of risk is inapplicable under the facts of a given case, "courts should spare juries intricate descriptions of opaque legal doctrines;" however, when "the facts of the case present a danger of jury confusion on the issue, an assumption of risk charge should be given." *Id.* at 1275. The United States Court of Appeals for the Third Circuit explained:

[W]hen the evidence adduced at trial presents a danger that the jury might reduce a plaintiff's recovery based on the impermissible theory of assumption of risk, then the trial judge should instruct the jury on how that doctrine differs

from contributory negligence. But when the evidence presents no such danger, then an adequate charge on contributory and comparative negligence suffices. Of course, the most difficult part of the inquiry is determining when the facts merit an assumption of the risk instruction.

*Id.*

"Although there is some overlap between assumption of risk and contributory negligence, generally the two defenses are not interchangeable." *Taylor v. Burlington N.R.R. Co.,* 787 F.2d 1309, 1316 (9th Cir.1986).

At common law an employee's voluntary, knowledgeable acceptance of a dangerous condition that is necessary for him to perform his duties constitutes an assumption of risk. Contributory negligence, in contrast, is a careless act or omission on the plaintiff's part tending to add new dangers to conditions that the employer negligently created or permitted to exist.

*Fashauer,* 57 F.3d at 1275 (quoting *Taylor,* 787 F.2d at 1316). A finding of contributory negligence on the basis of an employee's "knowledge that a dangerous condition in his line of duty existed and his working in that line of duty," nonetheless, is actually "assumption of risk masquerading under another name." *Rivera v. Farrell Lines, Inc.,* 474 F.2d 255, 257–58 (2d Cir.1973), *cert. denied,* 414 U.S. 822, 94 S.Ct. 122, 38 L.Ed.2d 55 (1973). In other words, evidence of a plaintiff's "knowledgeable acceptance of a dangerous condition" implicates the defense of assumption of the risk, not contributory negligence. *Joyce v. Atlantic Richfield Co.,* 651 F.2d 676, 682–83 (10th Cir.1981); *see also Koshorek,* 318 F.2d at 367 ("[A]ssumption of risk is a matter of knowledge of the danger and intelligent acquiescence in it, while contributory negligence is a matter of some fault or departure from the standard of reasonable conduct, however unwilling or protesting the plaintiff may be.").

Noting that the concept of assumption of risk "often is used as an umbrella term to describe a number of discrete and dissimilar concepts" in *Fashauer,* the United States Court of

Appeals for the Third Circuit discussed "what theory of assumption of risk Congress sought to prohibit when it barred the defense under the FELA." *Fashauer*, 57 F.3d at 1275–76. The Court elucidated: "In our view, the history behind the FELA and the Supreme Court's pronouncements in pre-and post-FELA cases makes clear that assumption of risk in the employment context refers to implied consent," *i.e.*, an employee's implied consent to assume the risks entailed in employment. *Id.* at 1279. The Court held:

> A plaintiff's recovery under the FELA never can be reduced on the basis that he or she implicitly consented to the risk by accepting employment with the railroad or by performing a task in the manner which the employer directed. This is true regardless of whether the plaintiff acted reasonably or unreasonably. Thus, even when a jury examining a plaintiff's position objectively would conclude that he acted unreasonably in accepting employment, or performing a task at all, such unreasonable actions for FELA purposes are characterized as assumption of risk rather than contributory negligence.

*Id.* at 1280.

> In so holding, the Court further stated:
>
> [I]f no evidence of impermissible assumption of risk has reached the jury, a correct instruction on contributory negligence will do. **However, if, either because of evidence introduced at trial or because of statements made by counsel in opening or closing arguments, there is a risk that the implied consent theory of assumption of the risk seeped its way into the case, the jury should be instructed that it may not find contributory negligence on the part of the plaintiff ... simply because he acceded to the request or direction of the responsible representatives of his employer that he work at a dangerous job, or in a dangerous place, or under unsafe conditions.**

*Id.* (internal quotation omitted) (emphasis added).

In the case *sub judice*, sufficient evidence was adduced at trial to support the giving of a jury instruction on

assumption of risk. In reaching this conclusion, we focus our attention on the evidence appellant presented at trial regarding appellees' choice of work or work site.

Appellant elicited testimony from appellees regarding their choice to work in the rail yards with mainline ballast. For instance, appellant's counsel questioned Young as follows:

[APPELLANT'S COUNSEL:] To your knowledge, [ ] Young, there are a number of people who have worked at Jessup for quite some time, fair to say?

[YOUNG:] Yes.

[APPELLANT'S COUNSEL:] And they have seniority like yourself, correct?

[YOUNG:] Some would, yes.

\* \* \*

[APPELLANT'S COUNSEL:] So if they, like yourself, they could bid into another job because they have the seniority to do that, right?

[YOUNG:] Correct.

[APPELLANT'S COUNSEL:] And it is your choice, is it not, to work at Jessup?

[YOUNG:] Yes.

[APPELLANT'S COUNSEL:] And it has been your choice to work at that facility in that yard on those walking surfaces for the ten years plus that you have been there, correct?

[YOUNG:] Correct.

Similarly, appellant elicited testimony from Hobgood that certain jobs involved less walking and he could decide the type of job he wanted to work based on his seniority.

Hartman also was questioned regarding his ability to chose his work site. Appellant's counsel questioned Hartman: "[Y]ou worked primarily at Curtis Bay [14] for the last 30

---

**14.** Curtis Bay is one of appellant's largest rail yards, consisting of about 57 tracks.

years?" and "[Y]ou work in Curtis Bay by choice?," to both of which Hartman answered in the affirmative. Appellant's counsel then revisited the topic of seniority, asking Hartman: "After you have been at the railroad a few years, as your seniority grows, you can choose where you want to work[?]," to which Hartman agreed. Appellant's counsel continued:

> [APPELLANT'S COUNSEL:] If you get some other fellows behind you to climb up the ladder a little bit, you can choose where you want to work?
>
> [HARTMAN:] That is right.
>
> [APPELLANT'S COUNSEL:] So you can choose to work in some other yard if you didn't like working in Curtis Bay?
>
> [HARTMAN:] Yes, sir.
>
> [APPELLANT'S COUNSEL:] I gather since you have worked there for 30 years, most of your time, **that yard is fine for you to work in as far as you can tell?**
>
> [HARTMAN:] I am not sure I understand your question.
>
> [APPELLANT'S COUNSEL]: **You have chosen to work there, right?**
>
> [HARTMAN:] **Yes, I have.**

(Emphasis added).

In closing argument, appellant's counsel highlighted the choices made by Davidson, Hobgood, Fedorchak, Bickerstaff, Young, Hartman, and Zientek with regard to their particular jobs and the yards at which they worked:

> All right. **Choice.**
>
> [ ] Davidson, he chose to work a job out of Hanover, Pennsylvania. You hear that was a little bit easier than some others and his seniority allows him to do that and that's what he chooses to do.
>
> [ ] Hobgood has enough seniority he can work any job he wants and he currently chooses to work a flagman's job.... He has worked out on the road since 1979. That's the job he has chosen to do. He has really not worked in the yards.

[ ] Fedorchak, he likes to change jobs every so often, so every six months or so he goes to another job and works it. He has been in Bayview[15] for the last year and a half.

[ ] Bickerstaff is a car man. He seniority [sic] to work in the car shop if he wanted to, but he likes working outside, he likes working in the yard, *particularly at Locust Point.*[16]

[ ] Young, he has a lot of seniority. That's what makes it possible for him to work at Jessup,[17] which is one of the most popular places to work, that that's where he chooses to work.

[ ] Hartman, he also has a lot of seniority. And he likes Curtis Bay. So that's where he has been working most of the last 30 years.

[ ] Zientek, he has enough seniority. He went back to Brunswick.[18]

(Emphasis added).

The evidence adduced and argument presented concerning appellees' choice of work or work site thus support the inference that appellees voluntarily and knowingly accepted the dangers inherent in working for appellant when they performed their jobs. Such evidence and argument increased the risk that, in the absence of an instruction, the jury would improperly infer that appellees had assumed the risk in performing their work. Therefore, the subject jury charge adequately, and quite appropriately, distinguished between conduct constituting contributory negligence and conduct constituting assumption of risk. Accordingly, the trial court did not err in giving a jury instruction on assumption of risk.

---

15. Bayview is a very large and older rail yard located in Baltimore.

16. Locust Point is a rail yard located in Baltimore.

17. Jessup is a rail yard situated 16 miles south of Baltimore.

18. Brunswick is a rail yard located in Washington County, Maryland.

## III.

## Statute of Limitations

Appellant contends that the issue of whether the claims of six appellees, Bickerstaff, Brown, Davidson, Hobgood, Short, and Young, were time barred under 45 U.S.C. § 56, the statute of limitations applicable in FELA actions, should have been submitted to the jury.[19] Thus, appellant argues, the court erred in ruling that their claims were timely as a matter of law.

Section 56 provides: "No action shall be maintained under this act unless commenced within three years from the day the cause of action accrued." Bickerstaff was the first to file his complaint on December 22, 2004. Brown, Davidson, Hobgood, Short, and Young followed suit, filing their claims on February 14, 2005. Thus the critical date of accrual for Bickerstaff's cause of action was December 22, 2001, and the date of accrual for the actions of Brown, Davidson, Hobgood, Short, and Young was February 14, 2002.

## A.

## Trial Court's Ruling: Timely as a Matter of Law

At the close of appellees' case, appellant moved for judgment based on FELA's three year statute of limitations with regard to Bickerstaff, Brown, Davidson, Hobgood, Short, and Young. The court denied appellant's motions, ruling:

> The Court feels that the issue[ ] of statute of limitations more appropriately [is] a jury question in light of the evidence that's been submitted and the argument[ ] made is that the issue as to statute of limitations as to all of those [six appellees] will be submitted to the jury for the jury's determination.

---

19. Appellant concedes that the claims of Fedorchak, Hartman, and Zientek were timely.

At the close of all evidence, appellant renewed its motion as to Bickerstaff, Brown, Davidson, Hobgood, Short, and Young. The court ruled:

[T]he Court notes that while [appellees] [are] not allowed to ignore medical conditions and [are] required to seek out appropriate medical treatment, the Court is reminded that case law is very clear that the mere fact that one has pain in the workday does not mean that it necessitates going to the doctor.

The Court turns it and reviews the facts and circumstances before it. There is sufficient evidence before the Court that the Court will deny the motion as to the statute of limitations as to each of said [appellees], and all other matters will go to the jury.

Appellant also presented to the court several instructions on the statute of limitations. The trial court chose not to give the instructions, instead informing the parties that appellant's motion for judgment was denied and that appellees' claims were timely filed as a matter of law.

## B.

### Standard Applied in FELA Actions

In *Miller*, we set forth the standard used when analyzing the statute of limitations in FELA cases. We stated: "In evaluating limitations in a FELA context ... 'the standard *is more lenient* than that which applies in the ordinary action.'" 159 Md.App. at 150, 858 A.2d 1025 (quoting *Crisman v. Odeco, Inc.*, 932 F.2d 413, 416 n. 2 (5th Cir.1991) (emphasis added in *Miller*)). When, as in the case *sub judice*, the nature of a plaintiff's injuries involve "a gradually progressive and almost indiscernible decline," as opposed to a "dramatic physical accident," we apply "the discovery rule" to determine the accrual date of the FELA action. *Id.* at 150–51, 858 A.2d 1025.

"[T]he discovery rule fixes accrual at the time the plaintiff first becomes aware of both 1) the existence of an

injury and 2) the cause of the injury." *Id.* at 151, 858 A.2d 1025. A plaintiff is "not obliged to discover his medical condition," but "once that medical condition is known to him, [he must] explore its legal implications within the limitations deadline." *Id.* at 151–52, 858 A.2d 1025. Further, " '[w]hen the specific date of injury cannot be determined because an injury results from continual exposure to a harmful condition over a period of time, the cause of action does not accrue until the injury manifests itself.' " *Id.* at 152, 858 A.2d 1025 (quoting *Rogers v. Illinois Cent. R.R. Co.*, 833 S.W.2d 426, 427 (Mo.App.1992)). Therefore, a claim in such case is deemed to accrue under FELA " 'when the claimant becomes aware or has reason to be aware that he has been injured and is aware or has reason to be aware of the cause of his injury.' " *Id.* at 153, 858 A.2d 1025 (quoting *Rogers*, 833 S.W.2d at 428).

We went on to explain that in the " 'case of actual knowledge, the cause of action accrues when the character of the condition and its cause first come together for the plaintiff.' " *Id.* (quoting *Rogers*, 833 S.W.2d at 428) (internal quotation omitted). The "should have known" test, however, is not a "could have known" test. *Id.* " 'Rather, it requires a very substantial common-sense likelihood that a reasonably careful person would discover the existence of the injury and its cause.' " *Id.* (quoting *Rogers*, 833 S.W.2d at 428).

In deciphering the accrual of a FELA action, the trial court has "only three legal possibilities." *Id.* at 150, 858 A.2d 1025. When the evidence is "so clear, decisive, and unequivocal" that the plaintiff had the requisite awareness more than three years prior to the filing of the claim, the trial judge is charged with deciding as a matter of law that the statute of limitations has run. *Id.* When, however, the evidence is "so clear, decisive, and unequivocal" that the plaintiff did not have the requisite awareness until after that date, the judge must decide the issue as a matter of law in the plaintiff's favor. *Id.* Lastly, and statistically the category in which most cases fall, is the "80% bulge of the bell-shaped curve where there [is] some plausible evidence pointing in each direction." *Id.* Un-

der the third scenario, "the resolution of the limitations issue [is] quintessentially a matter of fact and not a matter of law." *Id.*

Appellant maintains that appellant "was entitled, at the very least, to submit the question of timeliness to the jury," because there was evidence that Bickerstaff, Brown, Davidson, Hobgood, Short, and Young knew or had reason to know of their alleged knee injuries (plus back injury for Brown) and that those injuries were work-related more than three years before filing their claims. Therefore, appellant concludes that it is entitled to a new trial on whether the claims of those six appellees were timely.

In its brief, appellant outlines the testimony of Bickerstaff, Brown, Davidson, Hobgood, Short, and Young showing that each individual began having knee (and in the case of Brown, knee and back) problems more than three years prior to the filing of their claims. Appellant argues that their testimony was "sufficient to create a jury question as to whether each of these [appellees] knew *or had reason to know* of his alleged medical condition more than three years before filing his claim—especially given [appellees'] affirmative duty to investigate any symptoms." (Emphasis in original). Appellant also points to the testimony of appellees' own expert that "the relationship between occupational activities and osteoarthritis is not a 'secret in the medical community,'" and argues that, "if [appellees] had sought medical care when they experienced their initial symptoms—as they were required to do under the discovery rule—. . . they would have learned about the alleged connection between their medical conditions and their employment for [appellant]." Appellant concludes that Bickerstaff, Brown, Davidson, Hobgood, Short, and Young "knew or had reason to know that their alleged medical conditions were allegedly work related more than three years before filing their claims."

Appellees respond that, "in light of the evidence presented at trial, including [appellant's] persistent position that [appellees] suffer from no significant symptoms of osteoarthritis and,

to the extent they may, that such condition is entirely unrelated to their decades of railroad service, the trial court properly ruled that all six [appellees'] claims were timely filed." According to appellees, appellant's "extensive efforts to establish that [appellees] were not injured and that the injuries were entirely unrelated to any railroad work ... negated its statute of limitations defense." Moreover, appellees contend that appellant's argument seeks to impose "the onerous duty ... on every railroad worker" to investigate, research, and seek out immediate medical treatment to discover the origin and extent of any ache or pain, and "to oversell as significant that which any reasonable and rationale person would find trivial, particularly in light of the physically demanding jobs [appellees] performed."

In *Miller*, the appellee, an injured railroad employee, brought a FELA action against the railroad, the appellant, seeking to recover damages for the osteoarthritis that he developed in both knees during the course of his employment as a conductor. 159 Md.App. at 148, 858 A.2d 1025. On January 20, 1997, after the appellee awoke with a swollen left knee, he went to the emergency room at the Johns Hopkins Bayview Medical Center. *Id.* His knee was x-rayed, and the appellee was prescribed aspirin and told to put ice packs on his knee for the swelling and to return to the hospital if the swelling got any worse or began to burn inside. *Id.* Following his visit to Bayview, the swelling went down and the pain went away. *Id.* The appellee had no problem with his knee for the next three and one-half years. *Id.* at 149, 858 A.2d 1025. Two days after the appellee left Bayview, an x-ray report was prepared; the report read "osteoarthritis." *Id.* at 157, 858 A.2d 1025. The appellee never saw the x-ray and was never informed about it. *Id.*

When questioned at trial about the existence of pain prior to his emergency room visit, the appellee testified that he had earlier pains in his knees, which he attributed to the process of aging. *Id.* The appellee had felt pain in his knees on and off since the early 1990's. *Id.* at 159, 858 A.2d 1025.

In August 2000, the appellee's knee "gave out" while he was getting ready to throw a switch. *Id.* at 149, 858 A.2d 1025. Following treatment by his family doctor, the appellee returned to work, but due to continuing pain or discomfort, was referred to an orthopedic specialist, who diagnosed the appellee's condition as osteoarthritis. *Id.* The appellee filed his claim on August 13, 2001. *Id.* at 150, 858 A.2d 1025.

The "critical question" before this Court in *Miller* was whether prior to August 13, 1998, three years before the filing of his claim, the appellee "knew or should have known both 1) that he was suffering from osteoarthritis in one or both of his knees, and 2) that the osteoarthritis was attributable to his years of pounding the ballast trail." *Id.* at 155, 858 A.2d 1025. We turned our attention to the appellee's 1997 visit to Bayview, noting that if the cause of action accrued at the time of that visit, the appellee's FELA claim was time-barred. *Id.* at 155–56, 858 A.2d 1025. Dismissing the appellant's contention that the appellee should have been charged with knowledge of his osteoarthritis in 1997, we concluded that the evidence presented "a jury question *at most.*" *Id.* at 158, 858 A.2d 1025 (emphasis added). We stated:

[The appellant] purports to be aghast at [the appellee's] failure to have called Bayview back and to have insisted on learning what impression, if any, was made of his x-ray. [The appellant] strongly suggests, without quite saying so, that under the "should have known" standard, [the appellee] should be charged with the knowledge of that impression. As it then proceeds to pose the accrual issue, [the appellant], without so much as a "by your leave," treats [the appellee's] state of self-awareness as, indeed, charged with such knowledge.

[The appellant] seems to posit, in that regard, some sort of intellectual or professional imperative to chase down the answer to every pending inquiry. There might, to be sure, be some such imperative churning within the reasonable operating surgeon, always fearful of malpractice suits; in the reasonable tort lawyer, always looking for an edge at the trial table; or in the reasonable national security officer,

always sensitive to the chance of a Congressional investigation. It is, at the very most, no more than a jury question, however, whether any such psychic imperative burns in the breast of the reasonable railroad worker. The reasonable railroad worker, to the extent that he thinks about it at all, might well be content to believe that a satisfactory x-ray result has been implicitly folded into the diagnosis, the prescription, and the presumptively final discharge that Bayview gave him.

*Id.*

Although we held in *Miller* that the court did not err in refusing to grant the appellant's motion for summary judgment on limitations grounds, we indicated that, under the circumstances of the case, the trial judge would not have erred if he had ruled that the appellee's claim was timely as a matter of law:

> Our review of the evidence satisfies us that there was, **at most,** a jury question as to whether [the appellee's] awareness of the medical situation was such that the cause of action accrued in January of 1997, to wit, before August 13, 1998. **To the extent to which we might harbor any tinge of doubt about the existence of a genuine jury question, moreover, our tilt would be decidedly toward a ruling, as a matter of law, in favor of [the appellee] and not toward a ruling, as a matter of law, in favor of [the appellant].** Whether there might have been a ruling in favor of [the appellee], as a matter of law, however, is a moot point, for **whatever arguably should have been done as a matter of law was done as a matter of fact.**

> \* \* \*

> **On slender evidence in this case, [the appellant] got the benefit of having the limitations issue treated as a jury question. It may have gotten more than it deserved.** It certainly was not entitled to anything more.

*Id.* at 160, 858 A.2d 1025 (emphasis added).

In *Young v. Clinchfield Railroad Company,* 288 F.2d 499, 500 (4th Cir.1961), the appellee, a former railroad worker,

brought a FELA action claiming that he developed silicosis from inhaling silica during the course of his employment with the appellant, a railroad company. On appeal, the appellant complained that the district court erred in deciding as a matter of law that the appellee's claim was not time-barred. *Id.* The appellant argued that,

> although a medical diagnosis of silicosis was not made until August, 1956, less than three years before suit was filed, there was evidence tending to show that [the appellee] should have known his condition earlier. [The appellant] relie[d] on the fact that [the appellee] quit his job in the summer of 1954, partly at least because of shortness of breath. [The appellant] reasons that as [the appellee] came from a mining region where silicosis is fairly common, he is to be charged with knowing that shortness of breath is one of the symptoms of this disease, and hence [the appellee] had reason to know as early as 1954 that he had contracted silicosis.

*Id.* at 503.

Because (1) the appellee had complained of several ailments, in addition to shortness of breath prior to terminating his employment with the appellant, (2) shortness of breath was indicative of medical conditions other than silicosis, and (3) no physician prior to the appellee's diagnosis intimated that the appellee had developed the disease despite the appellee's "frequent sojourns to the hospital," the Court concluded that the appellee was not reasonably expected to know of his condition. *Id.* at 503–04. Accordingly, the Court held that the district court properly refused to submit the issue of limitations to the jury. *Id.* at 504.

The critical question before this Court in the instant case is whether Bickerstaff, Brown, Davidson, Hobgood, Short, and Young knew or had reason to know, more than three years before filing their claims, (1) that they suffered osteoarthritis and/or torn menisci to their knees and, in the case of Brown, a herniated disc to his back, and (2) that these conditions were

work-related. We first examine their testimony and other evidence on this question.

Bickerstaff initially experienced left knee pain in 1994 but did not seek treatment until 2004, when he saw Dr. Constantine Misoul on the advice of counsel. Bickerstaff described his initial pain as "[j]ust a tingling sensation, a throbbing." Dr. Misoul testified that in 2004 Bickerstaff reported that he had been having "problems with both of his knees for ten years."

Brown testified that he first experienced back pain in 2000. At that time he received pain medication from his family physician. He did not seek any medical treatment beyond his family doctor until November 13, 2004, when he saw Dr. Misoul on the advice of counsel. At the time that he saw Dr. Misoul, Brown's back was "sore[ ]" and "really bothering [him]," and his right knee was "aching and sore." Dr. Misoul indicated that in 2004 Brown told him that he had been experiencing back and knee pain "on and off for many years," which Dr. Misoul understood to mean more than five years.

Davidson started experiencing pain in his right and left knees in approximately 1999. He described the feeling as "pains stooping down, kneeling climbing, walking;" he stated that his knees "creaked or popped" and that he "had a lot of pain." Dr. Misoul testified that, in 2004, Davidson reported that he had been having "right knee difficulties for five years."

Hobgood testified that he first started experiencing problems with his knees in 2001. He mentioned the knee pain to his family doctor but did not seek treatment until he was advised to do so by counsel in November 2004. Hobgood testified to having reported to Dr. William Launder in 2005 that he had knee pain from 1995 through 2002.

Short's knee pain began intermittently in 2001. He did not seek treatment until he was advised to see Dr. Misoul by counsel in December 2004.

Young testified that he began to experience knee pain in 1999. Young complained of knee problems to his family physician in 1999 and was referred to an orthopedic doctor

who recommended arthroscopic surgery, which Young refused. Dr. Douglas Shepard, an expert witness called by appellant, testified that in 2004 Young complained of a "five-year history of bilateral or both-sided knee pain."

Appellant contends that the above facts constitute "some plausible evidence" that the six appellees knew or should have known of their knee and/or back conditions prior to February 14, 2002, or, in Bickerstaff's case, prior to December 22, 2001. We disagree.

It is undisputed from the evidence that Bickerstaff, Brown, Davidson, Hobgood, and Short were not diagnosed with osteoarthritis, torn menisci, or a herniated disc more than three years before the filing of their claims. Appellant concedes that "the primary diagnoses, treatments, surgeries, and prognoses for [appellees'] medical conditions" were provided by physicians to whom appellees' counsel referred these appellees in 2004. Although Brown and Hobgood visited a family physician prior to February 14, 2002, neither man was diag-· nosed, and Brown was only prescribed pain medication. There is no other evidence that they knew or should have known that they had a medical condition to their knees or back.

The generalized aches and pains of these appellees occurring before the three year limitations period were not sufficient to charge them with "reason to know" that they had a work-related medical injury, especially in the context of other causes, like the aging process and the rigors of working a physically demanding job.[20] " 'An employee's mere suspicion

---

**20.** In discussing the limitations issue in a FELA case, the U.S. Court of Appeals for the Seventh Circuit wrote:

> It is not the law that if you are scratched as a result of someone's negligence or other tort you must sue, even though the scratch is trivial, against the possibility that it might develop into something serious after the period of limitations has run. "Presumably there is room for a *de minimis* concept where there has been tortious impact but such inconsequential manifestations that a reasonable person would not consider he was either injured or that it was appropriate to make inquiry."

of an injury or its probable cause, standing alone, is not the operative standard for determining when a cause of action accrues under FELA.'" *Miller*, 159 Md.App. at 160, 858 A.2d 1025 (quoting *Gay v. Norfolk and W. Ry. Co.*, 253 Va. 212, 483 S.E.2d 216, 219 (1997)). Therefore, the trial court did not err in determining that the claims of Bickerstaff, Brown, Davidson, Hobgood, and Short were timely filed under 45 U.S.C. § 56.

 Young, however, went to see his physician, was referred to an orthopedic specialist, and declined the specialist's recommended treatment, arthroscopic surgery. Thus, because a jury could infer from that evidence that Young was diagnosed with osteoarthritis or torn menisci and therefore knew or had reason to know of a knee injury, we direct our attention to the question of whether he knew or had reason to know that his medical condition was work-related.

Appellant acknowledges that Young testified that he did not learn that his medical condition was work-related until appellees' counsel referred him to a physician in 2003 or 2004. The only evidence cited by appellant to support its argument that Young should have been aware of the link between his medical condition and appellant's work conditions was Young's testimony that, in his opinion, walking on large ballast was unstable, like walking on ice. On that testimony alone, we can "clear[ly], decisive[ly], and unequivocal[ly]" conclude that Young did not know, nor should he have known, that his knee problems were work-related prior to February 14, 2002. *See Miller*, 159 Md.App. at 150, 858 A.2d 1025. Therefore, the court did not err in ruling that Young's claim was timely as a matter of law.

## IV.

### Evidence of Retirement Age

Appellant's next claim of error involves the computation of damages, namely, appellees' loss of future earnings as a result

*Lancaster v. Norfolk & W. Ry. Co.*, 773 F.2d 807, 821 (7th Cir.1985), *cert. denied*, 480 U.S. 945, 107 S.Ct. 1602, 94 L.Ed.2d 788 (1987).

of their injuries. In discussing the computation of the appellee's loss of future earnings in *Tiller*, 179 Md.App. at 321, 944 A.2d 1272 we stated:

> The calculation is straightforward. Once the multiplicand of lost wages for the present year is established, the multiplier is then the number of years between the employee's current age and the age at which the employee would ordinarily have been expected to stop working if the injury had not occurred. That expectation inevitably involves some degree of speculation. A number of factors may enter into the making of what amounts to such an educated guess. One significant factor, of course, is the announced intention of the employee himself. Even if an employee is eligible to retire at age 60, he is not required to do so.

In the instant case, each appellee testified that, prior to his injury, he intended to continue working until age 64 or 65.

Appellant contends that the court abused its discretion in refusing to allow appellant to cross-examine appellees' economist, Dr. Bruce Hamilton, with regard to statistics showing that most employees in the railroad industry retire close to 60, not 65. Consequently, appellant argues that Dr. Hamilton, in predicting each appellee's future lost income, improperly accepted each appellee's testimony that he intended to work until age 64 or 65 and made "no reduction for the risk of an earlier retirement." According to appellant, had the court allowed appellant to cross-examine Dr. Hamilton with the retirement-age statistics, "the jury very well could have concluded that it was 'reasonably certain' that some or all [appellees] would have retired earlier than they claimed during their testimony."

Appellees counter that appellant never sought to introduce statistics on the retirement age in the railroad industry. First, appellees argue that appellant merely questioned Dr. Hamilton on cross-examination about his *awareness* of statistics that a majority of railroad employees retired at age 60, never indicating an intention to introduce "some learned treatise or other admissible source of evidence." Second, appel-

lees assert that appellant "continually referred to the subject matter of the evidence, namely that [appellees] were eligible to retire at age 60, in the cross[-]examination of [appellees] and of Dr. Hamilton, as well as, in opening statement and closing argument." (Footnote omitted). Thus, because the evidence appellant sought to admit "is found extensively . . . in this case," appellees submit that the excluded evidence was "at best . . . entirely cumulative."

 "Rulings on the admissibility of evidence must normally be left to the sound discretion of the trial judge in actions under the Federal Employers' Liability Act." *Lavender v. Kurn,* 327 U.S. 645, 654, 66 S.Ct. 740, 90 L.Ed. 916 (1946). In a FELA action tried in state courts, the trial court "will apply federal substantive law but state procedural law, including the state law of evidence." *Miller,* 159 Md.App. at 182, 858 A.2d 1025; *see also St. Louis Sw. Ry. Co. v. Dickerson,* 470 U.S. 409, 411, 105 S.Ct. 1347, 84 L.Ed.2d 303 (1985) ("As a general matter, FELA cases adjudicated in state courts are subject to state procedural rules, but the substantive law governing them is federal.").

On cross-examination, Dr. Hamilton testified as to appellees' loss of future earnings:

[APPELLANT'S COUNSEL:] Good afternoon, Dr. Hamilton.

[DR. HAMILTON:] Good afternoon.

[APPELLANT'S COUNSEL:] I have a few questions for you. I want to talk about economics just a little bit and talk about assumptions some.

Certainly, to do the calculations that you just shared with all of us, you have to make some assumptions as you have said, right?

[DR. HAMILTON:] Correct.

\* \* \*

[APPELLANT'S COUNSEL:] I want to talk briefly about planned retirement age. **Are you aware that the statis-**

tics from the railroad retirement board show that just last year, the overwhelming majority of people that retire in the railroad industry were, in fact, 60 years old?

[APPELLEES' COUNSEL:] Objection.

THE COURT: Approach.

(Whereupon, at the bench.)

[APPELLEES' COUNSEL:] Your Honor, at this juncture, these are not assumptions, these are things that are evidence before the jury in terms of ages and things like that. **So if there is some statistics that Dr. Hamilton to see [sic], counsel ought to show it to them.**

[APPELLANT'S COUNSEL:] **Just asking him if he is aware of them.**

THE COURT: The problem of it is it doesn't mean a hill of beans when it comes to individuals that are specifically plaintiffs before us. He is here as an economist and I will have to sustain the relevance. It is irrelevant to these plaintiffs and the information provided.

[APPELLEES' COUNSEL:] Thank you.

[APPELLANT'S COUNSEL:] Statistics related to conductors and trainman.

THE COURT: I am not even suggesting that you are wrong.

[APPELLANT'S COUNSEL:] Okay.

THE COURT: You can ask the question of him, of it.

[APPELLANT'S COUNSEL:] Okay.

THE COURT: But based on the overall numbers as to the industry, it is not important because we're dealing with them.

[APPELLANT'S COUNSEL:] Thank you.

[APPELLEES' COUNSEL:] Thank you, Your Honor.

(Whereupon, in open court.)

THE COURT: The objection is sustained.

(Emphasis added).

■ Preliminarily, we agree with appellees that appellant never sought to introduce any statistical evidence regarding the retirement age of the majority of railroad employees. Following appellees' objection, counsel conferred at the bench. At that time, appellees' counsel requested that appellant's counsel show Dr. Hamilton the statistics to which he was referring. Appellant's counsel responded that he just wanted to see if Dr. Hamilton was aware of the statistics and never informed the court that he had statistical evidence on hand to be admitted as evidence or to show to Dr. Hamilton. At no time thereafter did appellant's counsel attempt to admit the unidentified statistical information. Because appellant's counsel never offered to introduce any evidence, we agree with appellees that appellant's contention that the trial court erred in preventing the introduction of evidence of the usual retirement age for railroad employees is without merit.

Furthermore, appellant's reliance on *Tiller* is misguided. In *Tiller*, this Court considered the propriety of the trial court's exclusion of certain evidence concerning the computation of the loss of future earnings of the appellee, an injured railroad employee. 179 Md.App. at 321, 944 A.2d 1272. The evidence excluded by the trial court in *Tiller*, however, concerned the appellee's eligibility to retire with full benefits at age 60. *Id.* The appellant railroad sought to admit the evidence of retirement eligibility to convince the jury that the appellant would have retired at 60 despite his testimony to the contrary. *Id.* at 322, 944 A.2d 1272. We acknowledged that an "employee's eligibility for retirement benefits at a particular age ... is unquestionably relevant evidence as to the probable age at which the employee might have been expected to stop working." *Id.* at 326–27, 944 A.2d 1272. We held that future retirement or pension benefits, however, were inadmissible under the collateral source rule because their probative value was "too attenuated to offset the potential misuse" by

the jury of the evidence to reduce the appellee's recovery against the appellant. *Id.* at 340, 944 A.2d 1272.

We stated in *Tiller* that evidence of one's eligibility to receive retirement benefits at age 60 is relevant and material. The question posed to Dr. Hamilton, however, did not bear on the appellees' eligibility to receive retirement benefits at age 60. Instead, appellant sought to question Dr. Hamilton, not with evidence but with purported statistical information that "the overwhelming majority of people that retire in the railroad industry were, in fact, 60 years old." Given that the question posed did not relate to appellees individually, the determination as to the relevance of Dr. Hamilton's answer fell within the trial judge's discretion. Therefore, the trial judge did not abuse his discretion in excluding appellant's cross examination question regarding industry retirement age statistics. *See Radman v. Harold,* 279 Md. 167, 173, 367 A.2d 472 (1977) ("[T]he admissibility of expert testimony is a matter largely within the discretion of the trial court and its action will seldom constitute a ground for reversal."); Miller, 159 Md.App. at 183, 858 A.2d 1025 ("The decision to admit or exclude 'expert' testimony is within the broad discretion of the trial court." (Internal quotation omitted)).

Likewise, we are unpersuaded that, because the trial judge sustained appellees' objection to appellant's questioning of Dr. Hamilton regarding industry retirement statistics, the jury could not have concluded that appellees would have retired earlier than they had claimed in their testimony. Appellees' testimony regarding their intended age of retirement was not, as appellant asserts, "dispositive proof on the subject." Rather, throughout the trial, the jury was repeatedly reminded that appellees were eligible to retire at age 60.

## V.

### Apportionment of Appellees' Damages

Appellant contends that the trial court erroneously refused to allow the jury to apportion appellees' damages "among [appellant's] own negligence, [appellees'] contributory negli-

gence, *and other causes.*" (Emphasis added). Appellant submits that "there was substantial evidence that [appellees'] medical conditions—even if attributable, in part, to negligence of [appellant]—had other significant causes such as obesity, smoking, other pre-existing medical conditions, and age."

Appellees assert that the trial court correctly declined appellant's request to allow the jury to apportion damages, because no evidence existed that appellees suffered "incapacitation, disability or pain" prior to the time they began working for appellant. Moreover, even assuming error, appellees argue that the court's refusal to instruct the jury on apportionment of damages was harmless, because appellant argued apportionment of damages as part of its comparative negligence defense. Appellees point out that appellant "strongly *and successfully* " argued the existence of other medical causation factors in closing argument. (Emphasis in original). Appellees attribute the jury's apportionment of 10% to 40% of fault to appellees' contributory negligence as proof that "the jury accepted [appellant's] position" with regard to other factors causing appellees' injuries.

At trial, appellant requested three instructions on apportionment [21] and provided the court with a proposed verdict

---

**21.** The first instruction specifically covered preexisting injuries:

 Plaintiff claims he aggravated a pre-existing condition. If you find that the Plaintiff's injury was due in part to a pre-existing condition and in part to Defendant's aggravation of that pre-existing condition, you must determine how much of the Plaintiff's injury is due to his pre-existing condition and how much of his present injury is a result of Defendant's aggravation of his pre-existing condition. Defendant can only be held responsible for that portion of Plaintiff's present injury that is the result of Defendant's aggravation of his preexisting condition.

The second proposed charge instructed the jury to discount its award by the likelihood that each appellee would have sustained his injuries irrespective of appellant's negligence:

 An award of damages for future wage loss, if any, must be reduced to reflect the likelihood, if you find one exists, that the plaintiff would have sustained future wage losses in any event due to other causes or factors. It is for you to determine what, if any, future wage loss the plaintiff is likely to sustain; what, if any, percentage of that will be a proximate result of the negligence alleged in this action and what, if

sheet that allowed the jury to assign liability to "other factors" in addition to appellant's negligence and appellees' contributory negligence. The court declined to use appellant's requested instructions or verdict sheet, rejecting appellant's argument as a request for a "second reduction" of the jury's damage award. Appellant noted its exception, arguing:

> Essentially, we would indicate to the Court that we feel it is error in this case not to instruct the jury as to how they are permitted to apportion damages under the FELA.

\* \* \*

> We think it is clear, Your Honor, that under the FELA, the jury is entitled to apportion damages. Not only to the negligence of an individual plaintiff and the negligence of a defendant but also to other causes. And we have case law that I would like to proffer to the Court that supports that proposition and I have brought with me copies of the cases . . .

\* \* \*

> We feel, Your Honor, that the jury should be instructed as to apportionment that they are entitled to make apportionment between negligence on the part of either of the parties as well as preexisting health conditions such as

---

any, percentage of that will be attributable to other causes or factors and to apportion your award of damages accordingly.

The third requested instruction addressed non-negligence causes other than preexisting conditions:

Defendant is also entitled to apportion damages between the various causes of plaintiff's injury, including pre-existing conditions and Plaintiff's own negligence. Based on the evidence in the case, determine, if you can, what percentage of Plaintiff's present condition was caused by the Plaintiff's work, and what percentage was caused by prior injuries, age, weight, pre-existing health problems, personal lifestyle choices, hereditary or genetic factors, other employment, and avocational activities, what percentage was caused by Plaintiff's own negligence and award Plaintiff only the percentage of his damages regarding his alleged injuries which are attributable to the work Plaintiff performed for the railroad.

preexisting arthritis, preexisting age considerations, preexisting weight problems, preexisting other health problems.

The court responded:

If that's the case, then what you are suggesting is that the jury is not weighing as to the damages as a result of the actual cause.

The Court's position is that the jury is only to award damages if there is a cause directly related to the negligence in question.

And that when they get to dealing with the actual apportionment, it is whether or not the directly related result from the negligence causes the jury to come to an amount and then the apportionment is based on the actual injury as the result of negligence.

The apportionment that you ask is for a second reduction of that based on something that shouldn't be in the calculation at all. That's a matter of argument by [appellant] to the jury as to he has a problem, and it shouldn't be in your calculation.

It is clear that, however, the instruction that goes to this is, even if there is an existing situation and there is an aggravation of the existing situation, the calculation is based on that.

Your exception is noted for the record, but the Court wants to make it very clear that when you are asking for an instruction that is a reduction based on what shouldn't be calculated in the amount of damages in the first place at all.

Your exception is noted for the record.

The verdict sheet given to the jury presented the following four questions as to each appellee:

1) Do you find by a preponderance of the evidence that [appellant] was negligent and that such negligence caused or contributed to the condition complained of by [appellee]?

Yes_____ No_____

If your answer is "No" to Question 1, skip Questions 2–4 .... If your answer is "Yes" to Question 1, proceed to Question 2.

2) Do you find by a preponderance of the evidence that [appellee] himself was negligent and that his negligence caused or contributed to his alleged injuries or conditions complained of?

Yes_____ No_____

If your answer is "Yes" to Question 2, proceed to Question 3. If your answer is "No" to Question 2, skip Question 3 and proceed to Question 4.

3) What proportion or percentage of [appellee's] damages do you find from a preponderance of the evidence to have been caused by the negligence of the respective parties?

Answer in terms of percentages.

[Appellant]_____% [Appellee]_____%

The total of the percentages given in your answer should equal 100%. Proceed to Question 4.

4) What sum of money, if any, do you find from a preponderance of the evidence to be the total amount of [appellee's] damages, without adjustment by application of any percentages you may have given in answer to Question 3?

$_____

■ The proper measure of damages under the FELA is "federal in character," and therefore, "a matter governed by federal law." *Norfolk & W. Ry. Co. v. Liepelt*, 444 U.S. 490, 492–93, 100 S.Ct. 755, 62 L.Ed.2d 689 (1980); *see also Meyer v. Union R.R. Co.*, 865 A.2d 857, 862 (Pa.Super.2004) ("The measure of damages under FELA is a matter of federal law, even though the action is brought in state court." (Internal quotation and citation omitted)).

A FELA plaintiff's injury or illness may result from multiple causes, including the employer's negligence, the plaintiff's contributory negligence, third-party negligence, and non-negligent causes. As previously discussed, FELA provides for diminution of damages in cases in which the employee's negli-

gence contributed to his own injuries. 45 U.S.C. § 53. In *Norfolk & Western Railway v. Ayers*, 538 U.S. 135, 165–66, 123 S.Ct. 1210, 155 L.Ed.2d 261 (2003), the United States Supreme Court held that an employer is not entitled to an apportionment of damages based on the extent to which the employee's damages were caused by a third-party tortfeasor. In cases involving third-party negligence, the employee is entitled to full recovery from the employer, and the employer may bring separate indemnification and contribution action against the jointly-liable tortfeasor. *Id.* at 162, 123 S.Ct. 1210.

The *Ayers* Court, however, left undisturbed a long line of FELA case law in which courts permitted the apportionment of damages for non-negligent causes. *See, e.g., Sauer v. Burlington N. R.R. Co.*, 106 F.3d 1490, 1494–95 (10th Cir.1996) (upholding the jury's apportionment of damages in a FELA case and concluding that evidence of apportionment need not be precise); *Stevens v. Bangor & Aroostook R.R. Co.*, 97 F.3d 594, 601, 603 (1st Cir.1996) (noting that apportionment is permitted under FELA when the evidence lends itself to a separation of the causes); *Lancaster v. Norfolk & W. Ry. Co.*, 773 F.2d 807, 822–23 (7th Cir.1985) (acknowledging that apportionment is proper in FELA cases when "the tort victim is highly vulnerable to injury and the damages he suffered must therefore be discounted (multiplied) by the probability, distinctly less than one, that but for the tort he would have lived a normal life"), *cert. denied*, 480 U.S. 945, 107 S.Ct. 1602, 94 L.Ed.2d 788 (1987); *Evans v. United Arab Shipping Co.*, 790 F.Supp. 516, 519 (D.N.J.1992) (stating that when "an employer's negligence aggravated a preexisting condition ... the defendant must compensate the plaintiff only for the aggravation itself and not for the preexisting condition"), *aff'd*, 4 F.3d 207 (3rd Cir.1993). Hence, FELA permits apportionment of damages for non-negligent causes of the employee's injuries.

Likewise, recent appellate cases establish that FELA permits the jury to apportion damages when the employee's damages were caused by the employer and a non-negligent factor. *See, e.g., Schultz v. Ne. Ill. Reg'l Commuter R.R.*

*Corp.*, 201 Ill.2d 260, 266 Ill.Dec. 892, 775 N.E.2d 964, 974 (2002) ("[I]n FELA cases, if sufficient evidence exists to indicate that an injury may have resulted from the aggravation of a preexisting condition, the jury should be instructed that if it finds for the plaintiff on the issue of liability, it should award damages only for the aggravation of the plaintiff's preexisting condition."); *Nichols v. Burlington N. & Santa Fe Ry. Co.*, 148 P.3d 212, 216–17 (Colo.Ct.App.2006) (upholding the trial court's jury instruction on apportionment directing the jury that, if it found the employee had a preexisting condition and negligence on the part of the railroad, to determine "the amount of damages, if any, caused *only* by the railroad's negligence." (Emphasis added)).

Chief among these cases is *Meyer.* In *Meyer,* the Superior Court of Pennsylvania held that the trial court erred in refusing to charge the jury on the principle of apportionment of damages when the appellee had a preexisting degenerative disc condition. 865 A.2d at 868–69. The railroad maintained on appeal that, because its experts testified at trial that the employee's herniated disc injury could have been caused by his preexisting degenerative disc condition, the railroad was entitled to charge the jury on apportionment of damages. *Id.* at 862. The court reviewed controlling federal precedent, noting that "while a tortfeasor is subject to liability for the full extent of the injury he caused, the damages should be reduced to reflect the likelihood that the pre-existing vulnerability or condition would eventually have injured the victim notwithstanding the tortfeasor's conduct." *Id.* at 863. The court concluded that, in such context, "apportionment clearly is within the ambit of FELA." *Id.* at 864. Because the jury instruction "did not cover apportionment aside from a reference to comparative negligence and did not discuss the preexisting condition as a possible cause for the injury," the court concluded that it was constrained to find reversible error for the omission of such "basic and fundamental material" in the jury instruction. *Id.* at 869.

Having determined that failure to instruct the jury on apportionment in a FELA case may constitute reversible

error, we must next determine whether there was sufficient evidence adduced at trial to support appellant's request for an instruction on apportionment of damages. *See, e.g., Meyer,* 865 A.2d at 866. Upon reviewing federal law on apportionment instructions in FELA cases, the court in *Meyer* concluded that a defendant need only produce "some evidence to support its proposed apportionment instruction" and is "not required to demonstrate an exact percentage" or a "mathematical proportion" representing the likelihood of the causal relationship. *Id.* at 866–67, 868. *See also Sauer,* 106 F.3d at 1494 (stating that the employer's evidence "need only be sufficient to permit a rough practical apportionment" and dismissing the need for "expert testimony . . . precisely apportion[ing] the injury").

When sufficient evidence is produced, "[a]pportionment of damages is best determined by the jury, and is properly addressed by [the court] through its instructions to the jury." *Rust v. Burlington N. & Santa Fe Railway Co.,* 308 F.Supp.2d 1230, 1231 (D.Colo.2003). In light of FELA's broad remedial purposes, however, if the fact finder cannot separate injuries caused or exacerbated by the employer's negligence and other non-negligence causes, the employer is liable for all of the employee's injuries. *Id.*

The case *sub judice* clearly involves damages caused by the negligence of appellant and the contributory negligence of appellees. Focusing on whether sufficient evidence was adduced at trial of other non-negligent causes of appellees' injuries, so as to necessitate a jury instruction on apportionment of damages, we review the record for evidence of these non-negligent causes as to each appellee.

Preliminarily, expert testimony at trial set forth the major risk factors for osteoarthritis. A "risk factor," as defined by Dr. Misoul, an orthopedic surgeon called by appellees, "means something that would *cause or lend someone to have* a certain problem or condition." (Emphasis added). Dr. Misoul testified that the major risk factors for osteoarthritis are "age,

obesity, heredity or genetic factors, acute trauma or acute injury, and repetitive or cumulative trauma."

First, according to Dr. Misoul, age is a risk factor because "as you get progressively older, closer to the 70 or 80 age, then, obviously, a larger percentage of people do develop arthritic changes" because of increased stress on the joints "for longer and longer periods of time." Second, obesity increases the stress on a person's joints, noting that the leg "takes two to four times [a person's] body weight of pressure" with every step. Dr. Misoul testified: "So obviously, the more you weigh, the more stress is going to cross that joint and, obviously, that joint will then deteriorate faster because of the extra weight." Third, with respect to genetics, Dr. Misoul testified that "there is a small percentage of osteoarthritis . . . which occurs in hereditary-type fashion." Stated otherwise, Dr. Misoul explained: "[I]f you are programmed in your genes to develop arthritis, then you should show arthritis in a lot of your joints." Fourth, Dr. Misoul described acute trauma as "severe injury to a joint, such as a fracture that goes through the bone and goes through the joint, a severe knee injury where you tear through the ligaments in your knee and tear up those meniscus washer-shaped cartilage." Lastly, Dr. Misoul testified that repetitive or cumulative trauma results from increased and constant pressure on a joint "by doing certain activities . . . such as kneeling, squatting and climbing, [and] carrying heavy weights."

In performing their respective jobs as employees of appellant, all appellees shared the risk factor of repetitive or cumulative trauma. They also shared one other risk factor—age. Appellees were over 50 years of age, and the evidence presented at trial showed that more than 30 percent of men over 55 years old have osteoarthritis of the knees. We shall discuss each appellee's other risk factors in turn, as noted by appellees' doctors.

Dr. John O'Hearn was called by appellees to testify as an expert in "the area of orthopedic surgery." Dr. O'Hearn testified that Zientek, Hartman, and Young were in his care.

According to Dr. O'Hearn, Zientek's genu varus, or bow-leggedness, constituted a risk factor for osteoarthritis. In addition, Zientek's age and obesity were risk factors for his knee problems. Neither heredity nor acute trauma, however, were risk factors in Zientek's case. Dr. O'Hearn ranked Zientek's cumulative trauma as his "primary risk factor," extra weight second, and age third.

Hartman's risk factor for osteoarthritis was his age, but heredity, obesity, or acute injury were not risk factors. In Dr. O'Hearn's opinion, cumulative trauma was the "number one risk factor," while age would be "number two," for Hartman's knee problems.

According to Dr. O'Hearn, Young was "a little heavier than he would like to be," but obesity in his case would not be "a major risk factor." Young's bowleggedness, on the other hand would "come[ ] into play." However, Young had no history of acute trauma. In sum, Dr. O'Hearn testified that Young's age and weight were lesser factors for his knee condition, while Young's bowleggedness and cumulative trauma exposure were the major risk factors.

Dr. David Lumsden, an orthopedic surgeon, testified on behalf of appellees regarding his patient, Bickerstaff. Dr. Lumsden described arthritis as "multifactorial, meaning that there are many factors involved in contributing to it." These include "wear and tear" or "microtraumatic injury," "[n]utritional status," "[f]itness level," "degree of previous trauma," habitus, structure, and weight. In Dr. Lumsden's opinion, Bickerstaff's left knee problems were caused by "mechanical stress that occurred over time as a cumulative effect." According to Dr. Lumsden, that Bickerstaff was overweight had a "relatively minor" effect on his knee problems. While other factors, including Bickerstaff's nutrition, may have played a role, Dr. Lumsden concluded that the "primary issue was a mechanical stress placed on him from the environment with which he worked." Dr. Misoul also testified that "occupation [was] a major contributing factor to the development of the problems on the side of [Bickerstaff's] knee." Bickerstaff's

age was a "small risk factor" and his weight was also a risk factor, although Dr. Misoul did not comment on the degree of risk from Bickerstaff's weight.

In regard to Brown, Dr. Misoul testified that, in his opinion, "occupation is a major risk factor in the development of [Brown's] low-back problems." Furthermore, Dr. Misoul concluded that "occupation is a major causative factor of the arthritic changes that [were] found inside of [Brown's] knee."

Dr. Misoul also testified regarding Davidson. According to Dr. Misoul, Davidson's "occupation is a major contributing factor to the development of the problems he has in his knee," while his age "is a very small factor."

In regards to Fedorchak, Dr. Misoul concluded that "his occupation is a major causative force in the development of his knee problems," while "[h]is age is a very, very small factor."

Dr. Misoul noted that Hobgood had suffered a gunshot wound to the left leg, but his opinion was that it was not "significant to his knee problem." Dr. Misoul "believe[d] that [Hobgood's] occupation [was] a factor in the cause of his patellar femoral difficulties." Other relevant factors, however, included Hobgood's age, "[h]is patellar laxity meaning he has some floppiness to his kneecaps," and "some period of time [when] he was ... a runner." Dr. Misoul noted that he did not have an opinion as to "which of the causes ... identified would be the most significant in the pathology" of Hobgood's condition.

Finally, Dr. Misoul testified concerning Short's condition. Dr. Misoul, however, did not provide an opinion regarding the cause of Short's condition.

In sum, in performing their respective jobs as employees of appellant, all appellees shared the risk factor of repetitive or cumulative trauma. They also shared in common one other risk factor—age. In addition, several of appellees shared obesity as a risk factor. Zientek and Young had genu varus, which was also a risk factor. Hobgood had patellar laxity and

had been a runner, both circumstances serving as risk factors.[22]

We conclude that this evidence was sufficient to instruct the jury on apportionment as to causes other than appellant's negligence and appellees' contributory negligence. The jury, as the fact finder, was entitled to determine what portion or percentage of damages was caused by factors other than the negligence of appellant and appellees. *See Rust*, 308 F.Supp.2d at 1231. We conclude, therefore, that the trial court erred in not properly charging the jury on apportionment of damages.

The court's error substantially prejudiced appellant's case. The jury had no opportunity to apportion damages to any causes other than appellant's negligence and appellees' contributory negligence. In fact, the verdict sheet directed the jury to apportion *100%* of appellees' damages to the negligence of the respective parties: "The total of the percentages given in your answer *should equal 100%.*" (Emphasis added). For instance, in the case of Young, Dr. O'Hearn testified at trial that, in his opinion, Young's knee injuries were caused 50 percent by his employment and 50 percent by his genetic bowleggedness. The jury, however, had no means of allocating any portion of Young's damages to his genetic condition. Accordingly, the jury's assignment of 80 percent fault to appellant and 20 percent to Young did not properly determine the portion of Young's damages attributable to appellant's negligence.

Finally, when the court's error is coupled with the instruction that the jury could impose liability if appellant's negligence "played any part no matter how small in bringing about

22. We perceive no distinction between injuries caused by a preexisting condition and those caused by a non-negligent concurrent factor, such as age or obesity. The rationale for the holdings in *Meyer* and other preexisting-condition cases is that, because it would not be able to recover a portion of its liability through contribution, an employer may seek apportionment of damages between those it caused and those that were caused by non-negligent factors. This rationale applies with equal force in a case involving a non-negligent concurrent cause.

or actually causing the injury or damages claimed," the prejudice to appellant is manifest. For these reasons we conclude that the trial court committed prejudicial error in its charge to the jury on the apportionment of damages, and thus we are constrained to vacate the judgment as to all appellees and remand for a new trial on damages.[23]

## VI.

### Railroad Retirement Board Disability Benefits

Appellant next asserts that "the trial court erred by excluding evidence of the Railroad Retirement Board disability benefits" of Davidson and Young. According to appellant, such evidence is "admissible in a FELA case if the plaintiff has made a specific and direct claim of financial distress." Appellant contends that Davidson made such a claim of financial distress when he testified:

[APPELLEES' COUNSEL:] How have you been mentally in terms of understanding that you are not going to be able to go back to work on [the] railroad?

[DAVIDSON:] It is kind of hard, because I am worried about my bills.

On cross-examination, Davidson testified as follows:

[APPELLANT'S COUNSEL:] As I understand your testimony this afternoon that you just gave, you've got a couple things on your mind with respect to finances. Is that what you just told [appellees' counsel], you're concerned about paying your bills?

[DAVIDSON:] Yes.

[APPELLANT'S COUNSEL:] And you are concerned about your money situation, you said, because you were planning on retiring at age 65, but now you are not going to be able to do that.

---

**23.** On remand, the jury will be required to make a new total damage award for each appellee, along with the determination of the appropriate percentage of that award attributable to appellant's negligence, that appellee's negligence, and other non-negligent causes.

Is that what you just said?

[APPELLEES' COUNSEL:] Objection.

According to appellant, Young made a claim of financial distress when he testified on direct examination:

[APPELLEES' COUNSEL:] Did you decide to go forward with the arthroscopic surgery at that time?

[YOUNG:] No, I didn't.

[APPELLEES' COUNSEL:] Why not?

[YOUNG:] I am kind of fearful of surgery. And plus I really couldn't afford to take the time off at that time.

On cross-examination, Young testified:

[APPELLANT'S COUNSEL:] And after those injections, you wanted to return to work at Jessup, did you not?

[YOUNG:] I wanted to—when I was—it's got a lot to do with my financial situation, too, here why I am trying to return to work. I really can't afford to be off work so long so I really did want to get back to work as soon as I thought that I could endure it.

Appellant concludes that it "had a right to challenge Davidson's and Young's specific and direct claims of financial distress with evidence of their [Railroad Retirement Board disability] benefits." "Because the trial court erroneously silenced [appellant] on this issue," contends appellant, the judgment in favor of Davidson and Young should be vacated and the trial court "should be instructed to conduct a new trial on damages."

Appellees respond that the trial court properly applied the collateral source rule to exclude evidence of any of the Railroad Retirement Board disability benefits. According to appellees, the testimony of Davidson and Young cited by appellant, when placed in context, fails to rise to the threshold necessary to be admitted under the narrow exception to the collateral source rule that requires the testimony indicate "a claim of financial distress" and a contention that the plaintiff "has no other sufficient source of income." Appellees add that the trial court's ruling on such an evidentiary issue should not

be reversed except for a clear abuse of discretion, and that, in regard to Young, appellant waived its alleged point of error by failing to place the issue before the trial court and failing to proffer what, if any, the Railroad Retirement Board disability benefits Young would have been entitled to. We agree with appellees.

"The collateral source rule permits an injured person to recover the full amount of his or her provable damages, 'regardless of the amount of compensation which the person has received for his injuries from sources unrelated to the tortfeasor.'" *Haischer v. CSX Transp., Inc.*, 381 Md. 119, 132, 848 A.2d 620 (2004) (quoting *Motor Vehicle Admin. v. Seidel*, 326 Md. 237, 253, 604 A.2d 473 (1992)). Railroad Retirement Board disability benefits are a common collateral source in FELA cases, and therefore evidence of such benefits is generally inadmissible under the collateral source rule. *Haischer*, 381 Md. at 132–34, 848 A.2d 620. "[T]here are certain limited exceptions to the inadmissibility of collateral source evidence in FELA ... cases," however. *Id.* at 135, 848 A.2d 620. One such exception is that, "if the plaintiff claims, in argument or through the introduction of evidence, that he/she is in financial distress due to the injury arising from the railroad's negligence ... *and has no other sufficient source of income,* evidence that the plaintiff is receiving Railroad Retirement benefits is admissible to rebut that claim." *Id.* (emphasis added). "The rationale for the exception is that, without it, the plaintiff may be able to paint a truly misleading picture for the jury of the extent of his/her loss and thus obtain a recovery in excess of what is warranted." *Id.* at 136, 848 A.2d 620. "The question then becomes whether [a plaintiff], through the argument and evidence [ ], opened the door to the admission of that evidence—whether he, in fact, asserted a level of poverty that was misleading." *Id.* at 135, 848 A.2d 620. To answer this question, we look to whether the testimony suggests that the plaintiff "was impecunious or had no other source of income." *Id.* at 136–37, 848 A.2d 620. "Evidence as to [a plaintiff's] expected work-life is not only relevant, but necessary, to establish the amount of his

wage loss[,]'" and such evidence does not open the door to collateral source evidence. *Id.* at 137, 848 A.2d 620.

In the instant case, the questioning leading up to Davidson's statement that he was worried about his bills focused on Davidson's normal daily life and routines, the hobbies and activities that he enjoyed before the deterioration of his knees, and whether he enjoyed working on the railroad and with his coworkers. Finally, Davidson was asked how he had "been mentally in terms of understanding" that he would not be going back to work. Davidson's full answer was:

> It is kind of hard, because I am worried about my bills. I am worried about the activity I am going to be able to do when—once all this is over with.
>
> I just, mainly, I am bored. I just—it is just bringing me down.

Davidson did not testify that he had no other sufficient source of income; he testified to his activities while out of work suffering from knee pain and to his feelings about those circumstances. In discussing his daily life around his house, Davidson referred to having limited mobility and suffering from pain, which prevented him from being more active. Being out of work—and more or less confined to his house— resulted in Davidson being bored and worried about his bills. He did not mention hardship or neediness, nor did he complain about being destitute. In other words, Davidson was testifying to the limitations on his work and home life, and the psychological effect that had on him. He was not testifying to the fact that he lacked other sufficient sources of income. Consequently, Davidson did not paint a misleading picture of his circumstances, and thus did not open the door to evidence of his Railroad Retirement Board disability benefits. The circuit court therefore did not abuse its discretion in choosing to exclude evidence of such benefits.

We turn next to appellant's contention that it was erroneously precluded from introducing evidence regarding Young's Railroad Retirement Board disability benefits. We begin with the oft-cited principle that, "[w]here evidence is

excluded, a proffer of substance and relevance must be made in order to preserve the issue for appeal," otherwise, "[the] issue is waived on appeal." *Sutton v. State,* 139 Md.App. 412, 452, 776 A.2d 47, *cert. denied,* 366 Md. 249, 783 A.2d 223 (2001). "[T]he question of whether the exclusion of evidence is erroneous and constitutes prejudicial error is not properly preserved for appellate review unless there has been a formal proffer of what the contents and relevance of the excluded testimony would have been." *Mack v. State,* 300 Md. 583, 603, 479 A.2d 1344 (1984), *superseded by statute on other grounds.* Thus, where the "issue was not preserved for appeal we are not required to review it." *Conyers v. State,* 354 Md. 132, 165, 729 A.2d 910 (1999), *cert. denied,* 537 U.S. 942, 123 S.Ct. 341, 154 L.Ed.2d 249 (2002).

In the instant case, appellant never proffered to the trial court that Young was receiving (or had received) Railroad Retirement Board disability benefits,[24] the amount of those benefits, and the relevance of those benefits to the case. Consequently, appellant waived any argument that it was prejudiced by the trial court's decision to exclude evidence of Young's Railroad Retirement Board disability benefits.

## VII

### Preclusion: The Federal Railway Safety Act

Lastly, appellant argues that appellees' FELA claims are precluded by the Federal Railway Safety Act ("FRSA"), 49 U.S.C. § 20101 *et seq.,* and the regulations promulgated thereunder. In particular, appellant relies on 49 C.F.R. § 213.103, which provides:

Ballast; general.

Unless it is otherwise structurally supported, all track shall be supported by material which will-

---

**24.** The record, in fact, indicates that Young was working as a trainman for appellant at the time of trial.

(a) Transmit and distribute the load of the track and railroad rolling equipment to the subgrade;

(b) Restrain the track laterally, longitudinally, and vertically under dynamic loads imposed by railroad rolling equipment and thermal stress exerted by the rails;

(c) Provide adequate drainage for the track; and

(d) Maintain proper track crosslevel, surface, and alinement.

■ In *Miller*, discussed *supra*, the appellant argued to this Court that the FRSA and its regulations, to wit, 49 C.F.R. § 213.103, precluded the appellee's FELA action involving personal injury from improper railroad ballast. 159 Md.App. at 161, 858 A.2d 1025. We disagreed and held that the FRSA and its regulations did not preclude the appellee's FELA suit. *Id.* at 166–67, 858 A.2d 1025. Nevertheless, "[i]n order to preserve this issue for possible review by the Court of Appeals of Maryland or the United States Supreme Court," appellant contends in the instant case that this Court erred in *Miller* in concluding that the appellee's claims were not precluded by the FRSA.

In *Miller*, we stated:

Even a surface glance at the FRSA regulation relied on by [the appellant] persuades us that it does not touch, let alone pervasively cover, the railroad yard conditions that allegedly fell short of the safe and healthy workplace environment that [the appellant] was obligated to provide for its employees. The regulation is concerned with the track and its immediately adjoining area and not with railroad yards. The obvious concern, moreover, is with the safety of the train, the prevention of derailments, and not the quality of the work place provided for employees.

*Id.* at 167, 858 A.2d 1025.

Adopting the language of the Colorado Court of Appeals in *Elston v. Union Pacific Railroad Company,* 74 P.3d 478 (Colo.Ct.App.2003), we reached the same result as that Court:

*"Nothing in the language of the FRSA conflicts with or undermines the primary function of FELA. Rather, the* purpose of the FRSA, to promote safety in all areas of railroad operations and reduce railroad related accidents, is consistent with the goal of FELA, to promote employee safety and hold railroads liable for injuries caused by their negligence.*

*We disagree with [the] defendant that its alleged compliance with the FRSA's track safety standards precludes a finding of negligence under FELA. Because walkways are* not covered by the FRSA, *whether [the] defendant complied with these regulations is immaterial in determining whether a* reasonable *person* in [the] defendant's situation *would have provided walkways alongside its tracks."*

159 Md.App. at 170–71, 858 A.2d 1025 (quoting *Elston,* 74 P.3d at 488) (emphasis added in *Miller).*

Appellant relies primarily on *Norris v. Central of Georgia Railroad Company,* 280 Ga.App. 792, 635 S.E.2d 179 (2006), a case decided after *Miller,* as authority for its claim that appellees' FELA actions are precluded by federal law and should be dismissed. In *Norris,* the appellant filed a FELA action alleging negligence on the part of the appellee, a railroad company, for maintaining an unsafe rail track consisting of mainline ballast. 635 S.E.2d at 181. The alleged negligence arose from an injury that the appellant sustained when operating a railroad switch in the appellee's rail yard. *Id.* After throwing a switch, the appellant was stung by a bee or a yellow jacket, and in reacting to the sting, tripped on ballast and injured his knee. *Id.* Following a discussion on the intersection of the FELA and the FRSA, the Court concluded: "To the extent that [the appellant's] FELA claim rests upon different ways by which [the appellee] might have supported *the mainline track* to comply with 49 C.F.R. § 213.103, the negligence claim is precluded." *Id.* at 183 (emphasis added).

The Court's conclusion in *Norris* is entirely consistent with our decision in *Miller.* In *Miller,* we recognized that 49 C.F.R. § 213.103 governs the ballast along *the mainline track*

*and not the ballast in the rail yard. See* 159 Md.App. at 167, 858 A.2d 1025 ("The regulation is concerned with the track and its immediately adjoining area and not with railroad yards."). In *Norris,* the testimony on which the appellant relied failed to show that he stumbled on ballast not located along the mainline track. 635 S.E.2d at 183–84. Therefore, the appellant in *Norris* did not establish that his negligence claim fell outside the purview of 49 C.F.R. § 213.103. *Id.* at 184. To the contrary, in the instant case, appellees rest their FELA claims on appellant's negligence in maintaining safe walkways in the rail yards and make no mention of alternate ways in which appellant might have supported its mainline track.

Also consistent with our decision in *Miller* is *Hendrix v. Port Terminal Railroad Association,* 196 S.W.3d 188 (Tex. App.2006). In *Hendrix,* the Court of Appeals of Texas considered whether the FRSA and its regulations precluded the appellant's claims for personal injuries arising out of allegations of unsafe walkway conditions and rail yard ballast that was "too large and mixed." 196 S.W.3d at 195, 193. The appellant argued that his claims were not precluded by the FRSA. *Id.* at 193. He emphasized that (1) "the federal regulations concerning ballast deal with the safety of the track, not the safety of employees working in and around tracks," and (2) "he was not injured because of a track structure that was not properly supported by ballast or because the ballast did not provide proper drainage, but rather because of unsafe walkway conditions and bad footing." *Id.* at 193 (internal quotations omitted). The appellee railroad countered, arguing that the regulations authorized by FRSA "specifically addressing ballast ... occup[y] the field with regard to the subject matter of the regulation and of rail safety," precluding, *inter alia,* "allegations in a FELA suit regarding the same subject matter." *Id.* (internal quotations omitted). The Court held that the trial court erred in granting summary judgment in favor of the railroad on the ground of preclusion, concluding: "[T]he FRSA does not preclude, as a matter of law, any and all employee FELA claims that *relate to or touch*

*upon walkway conditions* and the size of *rail yard ballast.*"
*Id.* at 201 (emphasis added).

In light of the most recent case law on the issue of preclusion, we decline to reconsider our holding in *Miller.*

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY VACATED. CASE REMANDED TO THAT COURT FOR A NEW TRIAL ON DAMAGES. APPELLANT TO PAY 75% AND APPELLEES TO PAY 25% OF COSTS.**